759 F.2d 21
 245 U.S.App.D.C. 1, 53 USLW 2528
 Michael D. BARNES, individually and as a member of U.S.
House of Representatives, et al., and United
States Senate, et al., Appellants,
v.
Ray KLINE, individually and in his capacity as
Administrator, General Services Administration, et al.
 No. 84-5155.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 4, 1984.
Decided Aug. 29, 1984.
Opinions Filed April 12, 1985.
As Amended April 12, 1985.
 
 Appeal from the United States District Court for the District of Columbia (Civil Action No. 84-00020).
 Michael Davidson, Washington, D.C., with whom M. Elizabeth Culbreth, Morgan J. Frankel, Michael Ratner, Washington, D.C., Morton Stavis, Hoboken, N.J., Peter Weiss and John Privitera, Washington, D.C., were on the brief, for appellants Michael Barnes, et al. and the United States Senate, et al. Steven R. Ross and Charles Tiefer, Washington, D.C., were on the brief, for appellants Speaker and Bipartisan Leadership Group of the United States House of Representatives.
 Richard K. Willard, Acting Asst. Atty. Gen., Dept. of Justice, Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., William Kanter and Marc Johnston, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellees.
 Before ROBINSON, Chief Judge, BORK, Circuit Judge, and McGOWAN, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge McGOWAN.
 Separate dissenting opinion filed by Circuit Judge BORK.
 McGOWAN, Senior Circuit Judge:
 
 
 1
 This appeal from the District Court[1] requires us to determine when legislation presented to the President for his review is subject to a "pocket veto" under Article I, section 7, clause 2 of the United States Constitution. That clause provides, in part, that if the President disapproves of a bill but fails to return it to its originating house, with his objections noted, within ten days after presentment to him, the bill becomes a law "unless the Congress by their adjournment prevent its Return, in which Case it shall not be a law." The precise issue at stake is whether adjournment of the Ninety-eighth Congress at the end of its first session "prevented" return of a bill presented to the President on the day of adjournment and thus created an opportunity for a pocket veto of that bill.
 
 
 2
 Appellants are thirty-three individual members of the House of Representatives,[2] joined by the United States Senate and the Speaker and bipartisan leadership of the House of Representatives.[3] Appellees are Ray Kline, Acting Administrator of General Services,[4] and Ronald Geisler, Executive Clerk of the White House. In the District Court, appellants sought declaratory and injunctive relief that would have nullified the President's attempted pocket veto in this case and required appellees to deliver and publish as law the bill that forms the subject matter of this litigation. On cross-motions for summary judgment, the court found for appellees on the ground that intersession adjournments[5] inherently prevent the return of disapproved legislation. Barnes v. Carmen, 582 F.Supp. 163 (D.D.C.1984). Our judgment was announced by order entered August 29, 1984, reversing the District Court's decision and remanding the case with instructions to enter summary declaratory judgment for appellants. 743 F.2d 45 (C.A.D.C.). The same order noted that this opinion would follow.
 
 
 3
 * On September 30, 1983, the House of Representatives passed H.R. 4042, 98th Cong., 1st Sess. (1983). 129 Cong.Rec. H7777 (daily ed. Sept. 30, 1983). The purpose of the bill was to renew, for the fiscal year ending September 30, 1984, the human rights certification requirements of the International Security and Development Co-operation Act of 1981 ("ISDCA"), Pub.L. No. 97-113, Sec. 728, 95 Stat. 1519, 1555-57 (1981), reprinted as amended in 22 U.S.C. Sec. 2370 note, at 460-61 (1982) (Restrictions on Military Assistance and Sales to El Salvador).[6] On November 17th, the Senate passed the bill without amendment. 129 Cong.Rec. S16,468 (daily ed. Nov. 17, 1983). The following day, the Speaker of the House and the President Pro Tempore of the Senate signed the bill, see 1 U.S.C. Sec. 106 (1982), and the House Committee on Administration presented it to the President for his consideration. 129 Cong.Rec. H10,663 (daily ed. Dec. 14, 1983).
 
 
 4
 On the same day, November 18th, the Ninety-eighth Congress adjourned its first session sine die,[7] and agreed by joint resolution to convene for its second session on January 23, 1984.[8] By standing rule of the House of Representatives, the Clerk of the House is authorized to receive messages from the President whenever the House is not in session. See Rules of the House of Representatives, Rule III, cl. 5, reprinted in H.R.Doc. No. 271, 97th Cong., 2d Sess. 318 (1983); 129 Cong.Rec. H22 (daily ed. Jan. 3, 1983). Prior to adjourning, the Senate conferred similar, temporary authority on the Secretary of the Senate. 129 Cong.Rec. S17,192-93 (daily ed. Nov. 18, 1983).
 
 
 5
 The President took H.R. 4042 under consideration, but neither signed the bill into law nor returned it to the House of Representatives with a veto message. Instead, on November 30th, he issued a statement announcing that he was withholding his approval of the bill. 19 Weekly Comp.Pres.Doc. 1627 (Nov. 30, 1983). Taking the position that the President's action constituted a valid exercise of the pocket veto power, appellees failed to deliver and publish H.R. 4042 as a public law of the United States.
 
 
 6
 Five weeks later on January 4th, appellants filed suit in the District Court to overturn the President's attempted pocket veto as constitutionally invalid and to compel the delivery and publication of H.R. 4042 as law. After the District Court advanced and consolidated the trial on the merits with appellants' application for preliminary relief, the Senate and the Speaker and bipartisan leadership of the House joined the action as intervenors likewise opposed to the President's action. See supra note 3.
 
 
 7
 In the District Court, appellants contend: (1) that adherence to constitutional purpose requires limiting the opportunity for a pocket veto to final adjournments between Congresses or to adjournments during which the houses of Congress have prevented return by failing to appoint agents to receive presidential messages during their absence; (2) that consequently President Reagan's failure to return H.R. 4042 to the House of Representatives within ten days of its presentment to him had resulted in the bill's becoming law under the Constitution; and (3) that appellees therefore are under an obligation to deliver and publish the bill as law pursuant to 1 U.S.C. Secs. 106a, 112 (1982). In support of their position, appellants cited Wright v. United States, 302 U.S. 583, 58 S.Ct. 395, 82 L.Ed. 439 (1938), in which the Supreme Court held that no opportunity for a pocket veto arises when, on the tenth day after presentment, the originating house is in an intrasession adjournment of three days or fewer, and Kennedy v. Sampson, 511 F.2d 430 (D.C.Cir.1974), in which this circuit held Wright to apply to all intrasession adjournments by one or both houses of Congress, as long as a congressionally authorized agent remains to receive veto messages from the President. The Legislative Branch argued that, because intersession and intrasession adjournments are indistinguishable under modern congressional practice, Wright should be further extended to intersession adjournments.
 
 
 8
 Appellees responded that the appointment of congressional agents to receive presidential messages while Congress is in adjournment has no constitutional significance, and that in any case the Supreme Court's ruling in the Pocket Veto Case, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929), which upheld a pocket veto during an intersession adjournment of the Sixty-ninth Congress, squarely governs this case. Moreover, while agreeing with appellants that no practical difference exists today between intersession and intrasession adjournments, appellees argued that there is a constitutionally significant distinction between adjournments for three days or less and those for a longer period, as evidenced by Article I, section 5, clause 4, under which neither house may adjourn for more than three days without the consent of the other. Any adjournment of over three days would, according to appellees, create an opportunity for a valid pocket veto.[9] Appellees contend that either construction of the congressional adjournment involved here--as an intersession adjournment or as one for more than three days--supports a finding that the President validly exercised his pocket veto power in this instance.
 
 
 9
 Accepting the first of the two alternative arguments raised by appellees, the District Court found the Pocket Veto decision "the only case directly in point" and concluded that "[u]nless and until the Supreme Court reconsiders the rule of that case," intersession adjournments would be deemed inherently to prevent the return of disapproved legislation to Congress. 582 F.Supp. at 168. Summary judgment was accordingly entered for appellees, whereupon the Legislative Branch filed its present appeal to this court.[10]
 
 II
 
 10
 Before examining the merits of this dispute, we address the question of whether appellants have standing to come before a federal court for resolution of the claims they press in the present litigation. In Kennedy v. Sampson, this court held that a single United States Senator had standing to challenge an unconstitutional pocket veto on the ground that it had nullified his original vote in favor of the legislation in question.[11] At the same time, the court stated that either house of Congress clearly would have had standing to challenge the injury to its participation in the lawmaking process, since it is the Senate and the House of Representatives that pass legislation under Article I, and improper exercise of the pocket veto power infringes that right more directly than it does the right of individual members to vote on proposed legislation. 511 F.2d at 434-36 & nn. 13 & 17.
 
 
 11
 In the present action, the thirty-three individual Representatives allege an injury identical to that of the individual lawmaker in Kennedy v. Sampson. The House Bipartisan Leadership Group and the United States Senate assert an injury of the second, more direct type described in that opinion, that is, an injury to the lawmaking powers of the two houses of Congress.[12] Under the law of this circuit,[13] therefore, all the appellants are properly before this court.
 
 
 12
 In a wide-ranging dissent from this panel's decision on standing, Judge Bork propounds the view that neither individual congressmen nor the houses of Congress may challenge in federal court the President's invocation of the pocket veto power. More broadly, the dissent reads Article III to bar any governmental official or body from pursuing in federal court any claim, the gravamen of which is that another governmental official or body has unlawfully infringed the official powers or prerogatives of the first. The dissent contends that previous decisions of this court permitting congressional standing do not bind this panel because they are the result of the court's failure to give proper regard to the underpinnings of Article III's standing requirement, namely, the separation of powers. While we are largely content to let this court's opinions speak for themselves, we wish to make clear the error in the dissent's understanding of Article III and the doctrine of separation of powers.
 
 
 13
 It is beyond contention that Article III's standing requirement is intended to "limit the federal judicial power 'to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process.' " Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting Flast v. Cohen, 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968)); accord Allen v. Wright, --- U.S. ----, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984); Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). It is also indisputable that in matters involving another branch of the government, the courts must be especially wary of overstepping their proper role, for "repeated and essentially head-on confrontations between the life-tenured branch and the representative branches of government will not, in the long run, be beneficial to either." United States v. Richardson, 418 U.S. 166, 188, 94 S.Ct. 2940, 2952, 41 L.Ed.2d 678 (1974) (Powell, J., concurring); accord Valley Forge, 454 U.S. at 473-74, 102 S.Ct. at 759; Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 222, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974).
 
 
 14
 Nonetheless, when a proper dispute arises concerning the respective constitutional functions of the various branches of the government, "[i]t is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Courts may not avoid resolving genuine cases or controversies--those "of a type which are traditionally justiciable"--simply because one or both parties are coordinate branches. United States v. ICC, 337 U.S. 426, 430, 69 S.Ct. 1410, 1413, 93 L.Ed. 1451 (1949). As Justice Rehnquist has stated:
 
 
 15
 Proper regard for the complex nature of our constitutional structure requires neither that the Judicial Branch shrink from a confrontation with the other two coequal branches of the Federal Government, nor that it hospitably accept for adjudication claims of constitutional violation by other branches of government where the claimant has not suffered cognizable injury.
 
 
 16
 Valley Forge, 454 U.S. at 474, 102 S.Ct. at 759. Thus, Supreme Court precedent contradicts the dissent's sweeping view that Article III bars any governmental plaintiff from litigating a claim of infringement of lawful function. See Immigration & Naturalization Service v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 2778, 2780, 77 L.Ed.2d 317 (1983) (Congress's intervention in litigation over the constitutionality of the one-house veto established requisite concrete adverseness); Nixon v. Administrator of General Services, 433 U.S. 425, 439, 97 S.Ct. 2777, 2788, 53 L.Ed.2d 867 (1977) (indicating that incumbent President would "be heard to assert" claim that Presidential Recordings and Materials Preservation Act unconstitutionally impinged upon the autonomy of the Executive Branch); National League of Cities v. Usery, 426 U.S. 833, 837 & n. 7, 96 S.Ct. 2465, 2467 & n. 7, 49 L.Ed.2d 245 (1976) (cities and states had standing to sue federal government over alleged infringement of " 'a constitutional prohibition' running in favor of the States as States "), overruled on other grounds, Garcia v. San Antonio Metropolitan Transit Authority, --- U.S. ----, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); United States ex rel. Chapman v. FPC, 345 U.S. 153, 154-56, 73 S.Ct. 609, 611-12, 97 L.Ed. 918 (1953) (Secretary of Interior had standing to press a claim against the Federal Power Commission for alleged infringement of the Secretary's role); Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), discussed infra pp. 28-29; see also Goldwater v. Carter, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (suit by congressional plaintiffs claiming an injury to their constitutionally mandated powers was dismissed on ripeness and political question grounds, but not on standing grounds, despite lower court opinions addressing standing issue).[14]
 
 
 17
 In congressional lawsuits against the Executive Branch, a concern for the separation of powers has led this court consistently to dismiss actions by individual congressmen whose real grievance consists of their having failed to persuade their fellow legislators of their point of view, and who seek the court's aid in overturning the results of the legislative process. See, e.g., Moore v. United States House of Representatives, 733 F.2d 946, 956 (D.C.Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985); Riegle v. Federal Open Market Committee, 656 F.2d 873, 881 (D.C.Cir.), cert. denied, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981); Harrington v. Bush, 553 F.2d 190, 214 (D.C.Cir.1977). Similarly, in Goldwater v. Carter, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979), Justice Powell, concurring in the judgment, would have dismissed as unripe a claim by several members of Congress that the President's action in terminating a treaty infringed their constitutional role: "Congress has taken no official action. In the present posture of this case, we do not know whether there ever will be an actual controversy between the Legislative and Executive Branches." Id. at 998, 100 S.Ct. at 534. As Justice Powell also stated, however, a dispute between Congress and the President is ready for judicial review when "each branch has taken action asserting its constitutional authority"--when, in short, "the political branches reach a constitutional impasse." Id. at 997, 100 S.Ct. at 533.
 
 
 18
 There could be no clearer instance of "a constitutional impasse" between the Executive and the Legislative Branches than is presented by this case. Congress has passed an Act; the President has failed to sign it, and has declared it not to be a law; Congress has challenged the validity of that declaration. The court is not being asked to provide relief to legislators who failed to gain their ends in the legislative arena. Rather, the legislators' dispute is solely with the Executive Branch. And it cannot be said that Congress is asking for an advisory judicial opinion on a hypothetical question of constitutional law; Congress is seeking a declaration, not about the legal possibility of pocket vetoes during intersession adjournments, but about the validity of a particular purported veto. Congress has raised a claim that is founded on a specific and concrete harm to its powers under Article I, section 7--a "[d]eprivation of a constitutionally mandated process of enacting law" that has actually occurred. Moore, 733 F.2d at 951; see United Presbyterian Church v. Reagan, 738 F.2d 1375, 1381-82 (D.C.Cir.1984); Dennis v. Luis, 741 F.2d 628, 630-31 (3d Cir.1984). That such injury is judicially cognizable has been clear since the Supreme Court held in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), that state legislators had standing to litigate the question of whether the legislature had ratified a constitutional amendment, within the meaning of Article V: "We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes.... They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect...."[15] As the Executive Branch itself concedes, Congress clearly has standing to litigate the specific constitutional question presented.[16]
 
 
 19
 The dissent believes, however, that the separation of powers would be better served in this case by remitting the question involved to a political solution, rather than a judicial one. The dissent understandably leaves unspecified the precise course of events contemplated: a "political solution" would at best entail repeated, time-consuming attempts to reintroduce and repass legislation, and at worst involve retaliation by Congress in the form of refusal to approve presidential nominations, budget proposals, and the like. That sort of political cure seems to us considerably worse than the disease, entailing, as it would, far graver consequences for our constitutional system than does a properly limited judicial power to decide what the Constitution means in a given case. To quote again from Justice Powell's opinion in Goldwater:
 
 
 20
 Interpretation of the Constitution does not imply lack of respect for a coordinate branch. Powell v. McCormack, [395 U.S. 486, 548, 89 S.Ct. 1944, 1978, 23 L.Ed.2d 491 (1969) ].... The specter of the Federal Government brought to a halt because of the mutual intransigence of the President and the Congress would require this Court to provide a resolution pursuant to our duty " 'to say what the law is.' " United States v. Nixon, 418 U.S. 683, 703, 94 S.Ct. 3090, 3105 (1974), quoting Marbury v. Madison, 1 Cranch 137, 177 (1803).
 
 
 21
 Goldwater, 444 U.S. at 1001, 100 S.Ct. at 536 (Powell, J., concurring in the judgment). By defining the respective roles of the two branches in the enactment process, this court will help to preserve, not defeat, the separation of powers. We turn, therefore, to the merits of this dispute.
 
 III
 
 22
 The respective roles of Congress and the President in the enactment of legislation are set forth in Article I, section 7, clause 2 of the Constitution, the first of the presentment clauses, which provides as follows:
 
 
 23
 Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law.... If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.
 
 
 24
 Thus, once a bill has been passed by both houses of Congress and presented to the President, he has ten days (not including Sundays) in which he may either sign the bill into law or return it to the originating house with his objections noted. If at the end of the time allotted he has done neither, the bill automatically becomes law as long as Congress has not by its adjournment prevented the President from returning the bill. If Congress's adjournment has prevented return, however, the bill automatically expires, in what has come to be known as a "pocket veto."
 
 
 25
 The question we confront is whether H.R. 4042 became law when the President failed to return it to the House of Representatives (where it originated) within the allotted time, or whether the bill expired because return was prevented by Congress's having adjourned its first session sine die on the day of presentment of the bill. We believe this question has a clear answer. Given that both the House of Representatives and the Senate had expressly arranged before adjourning for an agent specifically authorized to receive veto messages from the President during the adjournment, it is difficult to understand how Congress could be said to have prevented return of H.R. 4042 simply by adjourning. Rather, by appointing agents for receipt of veto messages, Congress affirmatively facilitated return of the bill in the eventuality that the President would disapprove it.
 
 
 26
 The District Court held, however, that Congress's adjournment must be deemed to have "prevented" return of H.R. 4042 to the House, notwithstanding the existence of an agent authorized to receive the President's veto, and that H.R. 4042 thus expired through a pocket veto. The court rested the decision on its reading of the two Supreme Court opinions and the one opinion by this court that have construed the pocket veto clause. We believe that the District Court has misapplied these precedents and that its decision consequently frustrates the recognized purpose behind the pocket veto clause.
 
 
 27
 An examination of the Framers' intent with respect to the pocket veto clause is a natural place to begin our analysis. Nowhere in the records of the Federal Convention of 1787, however, is there any reference to the concept of a pocket veto, or for that matter, to any of the specifics of the enactment process. Rather, the delegates were concerned with the broad issues of whether the President ought to have the power to veto legislation and, if so, whether Congress should be able to override a presidential veto.[17] On these issues, however, the records speak plainly and decisively. The delegates were firmly convinced that the President must have some power to revise legislative acts. But an absolute veto, they equally strongly believed, was dangerous and unwarranted. As James Madison put it: "To give such a prerogative would certainly be obnoxious to the temper of this country." 1 M. Farrand, The Records of the Federal Convention of 1787, at 100 (rev. ed. 1966).[18] Thus, the delegates unanimously voted down an absolute veto, id. at 103, and eventually approved a resolution stating, "That the national Executive shall have a Right to negative any legislative Act, which shall not be afterwards passed, unless by two third Parts of each Branch of the national Legislative." 2 id. at 132.
 
 
 28
 The precise means of providing for a qualified presidential veto were devised by the Committee of Detail in what, with minor modifications,[19] would ultimately constitute Article I, section 7, clauses 2 and 3 of the Constitution. The Committee's product reflects the recognition that to safeguard the qualified veto requires more than simply a set of rules directing Congress to present bills to the President and directing the President to approve or return such bills. For in the absence of any sanctions for violation of such rules, the President might simply decline to act upon a duly presented bill in order to block congressional reconsideration and thereby achieve through inaction what the Framers refused to permit him, namely, an absolute veto. The veto provision therefore mandates that a bill becomes law at the end of a ten-day period if not returned. Without more, however, Congress, which controls its own calendar,[20] could in turn vitiate the President's qualified veto by cutting short or entirely eliminating, through adjournment, the period of time alloted the President to return a bill with his objections. It is that evil which the pocket veto clause forestalls by withholding the status of law from a bill whose return Congress prevented.[21] The pocket veto clause thus is intended, not as an affirmative grant of power to the Executive, but rather as a limitation on the prerogative of Congress to reconsider a bill upon presidential disapproval, a limitation triggered when Congress "by their Adjournment prevent [the bill's] Return."The manifest purpose of the pocket veto clause has guided application of the clause by the Supreme Court, as well as this circuit.[22] In The Pocket Veto Case, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929), the earliest judicial discussion of the pocket veto clause, the Supreme Court confronted the issue of whether return of a bill to the Senate, where it originated, had been prevented when the Sixty-ninth Congress adjourned its first session sine die fewer than ten days after presenting the bill to the President. Justice Sanford's opinion for the Court began by declaring that the term "adjournment" is used in the Constitution to refer to any occasion on which a house of Congress is not in session, and dismissed the contention that the term refers solely to final adjournments of a Congress:
 
 
 29
 We think that under the constitutional provision the determinative question in reference to an "adjournment" is not whether it is a final adjournment of Congress or an interim adjournment, such as an adjournment of the first session, but whether it is one that "prevents" the President from returning the bill to the House in which it originated within the time allowed.[23]
 
 
 30
 An earlier case, the Court then noted, had held that a house of Congress is only constituted when a quorum of the membership is present. Because the veto provision specifies that the President must return a disapproved bill to its originating house, and because neither house was in session to receive delivery of the returned bill in that instance, the Court reasoned, return must be deemed to have been prevented.
 
 
 31
 Counsel for the House of Representatives had argued that, when the originating house is not in session, return may be made consistently with the constitutional provisions by delivering the bill, with the President's objections, to a proper agent of the house of origin, for subsequent delivery to that house when it reconvenes. Addressing itself to this argument, the Court noted first "the fact that Congress has never enacted any statute authorizing any officer or agent of either House to receive for it bills returned by the President during its adjournment, and that there is no rule to that effect in either House." Id. at 684, 49 S.Ct. at 468. Moreover, the Court stated, "delivery of the bill to such officer or agent, even if authorized by Congress itself, would not comply with the constitutional mandate." The Court explained its position thus:
 
 
 32
 Manifestly it was not intended that, instead of returning the bill to the House itself, as required by the constitutional provision, the President should be authorized to deliver it, during an adjournment of the House, to some individual officer or agent not authorized to make any legislative record of its delivery, who should hold it in his own hands for days, weeks or perhaps months,--not only leaving open possible questions as to the date on which it had been delivered to him, or whether it had in fact been delivered to him at all, but keeping the bill in the meantime in a state of suspended animation until the House resumes its sittings, with no certain knowledge on the part of the public as to whether it had or had not been seasonably delivered, and necessarily causing delay in its reconsideration which the Constitution evidently intended to avoid.
 
 
 33
 Id. at 684, 49 S.Ct. at 468. Two concerns thus led the Court to believe that return to an agent of the original house would not adequately guarantee the President the opportunity to exercise his qualified veto: (1) delivery to an agent unauthorized to make an official record of delivery would engender uncertainty over whether timely return had in fact been made and thus whether the bill had or had not become law; and (2) such a return would be followed by lengthy delay before possible reconsideration by the originating house.
 
 
 34
 That the Court was not categorically denying the use of agents for delivery of veto messages was made clear in the Court's next, and last, encounter with the pocket veto clause. In Wright v. United States, 302 U.S. 583, 58 S.Ct. 395, 82 L.Ed. 439 (1938), the Court was called upon to determine the effectiveness of the President's return of a bill on the tenth day after presentment, during a three-day adjournment by the originating house only. The Court, speaking through Chief Justice Hughes, held that return to that house had not been prevented and that, therefore, delivery of the veto message to the Secretary of the Senate constituted an effective return.
 
 
 35
 In the first place, the Court noted, the Senate alone had adjourned, not "the Congress." Under the pocket veto clause, only an adjournment by "the Congress" can prevent return of a bill. Id. at 587, 58 S.Ct. at 397. The Court then dismissed the notion that a bill cannot be returned by the President to the originating house if that house is in an intrasession adjournment. In this instance, the Court stated, there clearly was no "practical difficulty" in making return during the adjournment: "The organization of the Senate continued and was intact. The Secretary of the Senate was functioning and was able to receive, and did receive, the bill." Id. at 589-90, 58 S.Ct. at 397-98. More importantly, the Court held that "[i]n returning the bill to the Senate by delivery to its Secretary during the recess there was no violation of any express requirement of the Constitution. The Constitution does not define what shall constitute a return of a bill or deny the use of appropriate agencies in effecting the return." Id. at 589, 58 S.Ct. at 397 (emphasis added).
 
 
 36
 As the Wright Court explained, the Pocket Veto Case was not to the contrary. Although the opinion in the earlier case had expressed the view that return can only be made to a house that is actually assembled and not to an agent of the house, that view did not control this case because it was grounded in concerns that were wholly inapplicable to a brief, intrasession adjournment by the originating house:
 
 
 37
 In such case there is no withholding of the bill from appropriate legislative record for weeks or perhaps months, no keeping of the bill in a state of suspended animation with no certain knowledge on the part of the public whether it was seasonably delivered, no causing of any undue delay in its reconsideration. When there is nothing but such a temporary recess the organization of the House and its appropriate officers continue to function without interruption, the bill is properly safeguarded for a very limited time and is promptly reported and may be reconsidered immediately after the short recess is over. The prospect that in such a case the public may not be promptly and properly informed of the return of the bill with the President's objections, or that the bill will not be properly safeguarded or duly recorded upon the journal of the House, or that it will not be subject to reasonably prompt action by the House, is we think wholly chimerical.
 
 
 38
 Id. at 595, 58 S.Ct. at 400. Given "the manifest realities of the situation," the Court held, return to an agent of the originating house was wholly effective. Id. Moreover, other adjournments might well not prevent return, although the Court declined to speculate as to which would or would not:
 
 
 39
 [C]ases may arise in which ... a long period of adjournment may result. We have no such case before us and we are not called upon to conjecture as to the nature of the action which might be taken by the Congress in such a case or what would be its effect.
 
 
 40
 Id. at 598, 58 S.Ct. at 401. Thus, the Court expressly left open the possibility that its analysis would apply to render return to an agent effective in adjournments other than brief, one-house, intrasession adjournments. The Court, however, did not leave future courts without guidance in applying the veto provisions, for it made clear that those provisions are to be interpreted in the light of their "two fundamental purposes." Id. at 596, 58 S.Ct. at 400. Although we have already set these forth at length, the Wright Court's formulation is important. On the one hand, the Court stated, the veto provisions are meant to ensure that "the President shall have suitable opportunity to consider the bills presented to him.... It is to safeguard the President's opportunity that Paragraph 2 of Sec. 7 of Article I provides that bills which he does not approve shall not become laws if the adjournment of the Congress prevents their return." Id. (citation omitted). At the same time, the provisions ensure "that the Congress shall have suitable opportunity to consider his objections to bills and on such consideration to pass them over his veto provided there are the requisite votes." Id. The Court plainly stated: "We should not adopt a construction which would frustrate either of these purposes." Id. (emphasis added).
 
 
 41
 Wright thus has twofold significance. First, and most important, its rule of construction requires a court to find that the President was truly deprived of his opportunity to exercise his qualified veto power before it may hold that return was "prevented"; a court that fails in this responsibility ends up sacrificing, without justification, Congress's right to reconsider disapproved legislation. Second, Wright indisputably establishes that mere absence of the originating house does not prevent return if (1) there is an authorized agent to accept delivery of a veto message, and (2) such a procedure would not entail the delay and uncertainty justly feared by the Court in the Pocket Veto Case.
 
 
 42
 Ten years ago, in Kennedy v. Sampson, 511 F.2d 430 (D.C.Cir.1974), this circuit applied the teaching of Wright to hold that return is not prevented by an intrasession adjournment of any length by one or both houses of Congress, so long as the originating house arranged for receipt of veto messages. Dismissing the argument distinguishing Wright on the ground that only the originating house had adjourned in that case, this court stated: "To hold that a return veto is possible while the originating House alone is in brief recess but not when both Houses are in recess would embrace ritual at the expense of logic." Id. at 440 (footnotes omitted). As did the Court in Wright, this court demonstrated that the concerns that had led the Court in the Pocket Veto Case to disapprove return to a house not in session were simply unjustified in the context of the particular type of adjournment at issue. This court stated: "The modern practice of Congress with respect to intrasession adjournments creates neither of the hazards--long delay and public uncertainty--perceived in the Pocket Veto Case." Id. This court noted that, whereas at the time of the Pocket Veto Case "intersession adjournments of five or six months were still common," id. at 441 (footnote omitted), in the past decade Congress's intrasession adjournments have typically consisted of "several recesses of approximately five days for various holidays and a summer recess (or recesses) lasting about one month." Id. (footnote omitted). Thus, this court concluded, "intrasession adjournments of Congress have virtually never occasioned interruptions of the magnitude considered in the Pocket Veto Case." Id. (footnote omitted).
 
 
 43
 As to the concern for public uncertainty, this court stated:
 
 
 44
 Modern methods of communication make it possible for the return of a disapproved bill to an appropriate officer of the originating House to be accomplished as a matter of public record accessible to every citizen. The status of such a bill would be clear; it has failed to receive presidential approval but may yet become law if Congress, upon resumption of its deliberations, passes the bill again by a two-thirds majority. This state of affairs generates no more public uncertainty than does the return of a disapproved bill while Congress is in actual session.
 
 
 45
 Id. (footnote omitted). Indeed, the Sampson court observed, "[t]he only possible uncertainty about this situation arises from the absence of a definitive ruling as to whether an intrasession adjournment 'prevents' the return of a vetoed bill. Hopefully, our present opinion eliminates that ambiguity." Id. (footnote omitted).
 
 
 46
 In addressing ourselves to the issue in this appeal, we are of course cognizant of the fact that the Pocket Veto Case remains the only decision concerning the opportunity vel non for a pocket veto during an intersession adjournment. It was the District Court's belief that the Pocket Veto Case is therefore "the only case directly in point." 582 F.Supp. at 168. Emphasizing that Wright did not purport to approve of delivery to agents during anything other than a three-day adjournment and that even Sampson's expansion of Wright did not reach beyond the line between intrasession and intersession adjournments, the District Court concluded that "neither Wright nor Kennedy v. Sampson give it license to depart from ... Pocket Veto." Id. The court accordingly held, in essence, that intersession adjournments per se create an opportunity for a valid pocket veto.
 
 
 47
 We appreciate the District Court's desire to remain within the boundaries of precedent. We disagree, however, with its assessment of where those boundaries lie. Moreover, we believe that the District Court's holding fails to serve the essential purposes of the veto provisions.
 
 
 48
 The principle that we believe runs through Pocket Veto and Wright is a simple one: whenever Congress adjourns, return of a veto message to a duly authorized officer of the originating house will be effective only if, under the circumstances of that type of adjournment, such a procedure would not occasion undue delay or uncertainty over the returned bill's status. Thus, in Pocket Veto, the Court disapproved delivery to a congressional officer during intersession adjournments because of the length of such adjournments--then five months or longer--as well as the uncertainty resulting from the lack of any regularized procedure for recording returns. By the same token, the brief duration of the one-house adjournment in Wright as well as the continued functioning of the entire congressional apparatus led the Court to an opposite result in that case. Finally, in Sampson, this court, following Wright's lead, reasoned that the pocket veto clause did not apply to any intrasession adjournments, because they did not pose either of the problems cited in Pocket Veto to any greater degree than did the three-day adjournment in Wright.
 
 
 49
 Nor, we are convinced, do intersession adjournments pose either of those problems, for as appellees freely conceded before the District Court,[24] such adjournments do not differ in any practical respect from the intrasession adjournments at issue in Wright and Kennedy v. Sampson. To be sure, an intersession adjournment delays possible reconsideration of a returned bill. But the delay is not substantial. In stark contrast to the five or six month intersession adjournments typical at the time of the Pocket Veto Case, intersession adjournments of the modern era have an average length of only four weeks, and are thus often even shorter than intrasession adjournments.[25] In this case, the adjournment was for nine weeks, somewhat longer than the average but still considerably shorter than the half-year-long adjournments common at the time of the Pocket Veto Case.[26]
 
 
 50
 The opportunity for immediate reconsideration after the intersession adjournment is guaranteed by the rules of each house of Congress, which mandate that all business unfinished at the end of the first session shall be resumed at the start of the second.[27] Moreover, because in this case, as is typical, the adjournment resolution provided that Congress could be reassembled at any time, and because the rules of the two houses permit the convening of congressional committees during adjournments,[28] reconsideration of a bill returned during an intersession adjournment is not necessarily delayed even the several weeks that such an adjournment lasts.
 
 
 51
 Uncertainty no more characterizes return during adjournment than does delay. As in the case of intrasession adjournments, the organization of each house of Congress remains unchanged, and their respective staffs continue to function uninterrupted.[29] More importantly, neither house any longer lacks an authorized procedure for acceptance of veto messages during adjournment. The House of Representatives provides by rule that return may be made to the Clerk of the House; the Senate, by resolution, provides for acceptance of veto messages by the Senate Secretary.[30] In both cases, the time of delivery is recorded on the journal of the respective house, and the message is retained by the authorized officer for presentation on the floor of the house immediately upon the house's reconvening. The return may thus "be accomplished as a matter of public record accessible to every citizen." Kennedy v. Sampson, 511 F.2d at 441. The status of a bill returned during an intersession adjournment therefore "would be clear; it has failed to receive presidential approval but may yet become law if Congress, upon resumption of its deliberations, passes the bill again by a two-thirds majority. This state of affairs generates no more public uncertainty than does the return of a disapproved bill while Congress is in actual session."[31]
 
 
 52
 That intersession adjournments no longer present any real obstacle to the President's exercise of his qualified veto power was recognized by Presidents Ford and Carter, both of whom assumed the effectiveness of return vetoes made during such an adjournment.[32] To conclude otherwise is "to ignore the plainest practical considerations and by implying a requirement of an artificial formality to erect a barrier to the exercise of a constitutional right." Wright, 302 U.S. at 590, 58 S.Ct. at 398. For the line that divides the first session of a Congress from the second has ceased to have any practical significance. Were it not for the Article I, section 4, clause 2 requirement that "[t]he Congress shall assemble at least once in every Year," that line, it seems to us, would completely dissolve.[33]
 
 
 53
 We fully recognize that clear rules respecting the pocket veto are vitally necessary in order that the status of bills in presidential disfavor be promptly resolved. In seeking clarity, we must be careful not to stray into arbitrariness by drawing an irrational line between intrasession and intersession adjournments. For we must be guided by the evident purpose of the pocket veto clause, which is simply to ensure that the President not be deprived of an opportunity to disapprove legislation. Manifestly, the president is no more deprived of that opportunity by a modern intersession adjournment than he was by the adjournments in Wright and Sampson. The line between intersession and intrasession adjournments, although a bright one, in no way furthers the intent behind the pocket veto clause, and it therefore fails to comport with the authorities interpreting the clause. Nothing is gained by drawing such a line. And what is lost is substantial, for a rule based on such a line deprives Congress of the final word on a significant portion of its legislation and grants the President an absolute veto, even though Congress has shown no disrespect for the President's role in the enactment process.
 
 
 54
 Appellees contend, nonetheless, that failure to recognize the intersession-intrasession line constitutes a departure from an historical understanding that the pocket veto clause is to apply during intersession adjournments. Brief for the Appellees at 29-30. In support of their argument they point to a change made between two drafts of the clause in the Committee of Detail. The clause, as taken from the New York Constitution, originally stated that an unreturned bill would become law, "unless the Legislature by their Adjournment prevent [the bill's] Return; in which Case it shall be returned on the first Day of the next Meeting of the Legislature." 2 M. Farrand, supra p. 31, at 167. This language would presumably have precluded the pocket veto entirely. The concluding phrase of the clause was stricken, however, and in its place were substituted the words "in which case it shall not," that is, it shall not become a law. Id. The change, appellees contend, evidences a conception on the part of the drafters that intersession adjournments would prevent return.
 
 
 55
 We would not deny the plausibility of appellees' explanation of the deletion of one phrase and the substitution of another in the Committee of Detail's early drafts of the veto provision. Indeed, that explanation receives indirect support from evidence indicating that the Framers envisioned that Congress would convene its annual session, complete its business within several months, and adjourn for the remaining three-fourths of the year.[34] As was the rule in the English Parliament of the era, business unfinished in the first session of a Congress was likely thought not to carry over to the second session.[35] With such a calendar in mind, members of the Committee of Detail may well have been of the view that adjournment at the end of the first session would prevent return of a bill.
 
 
 56
 But the adjournment practices of Congress as envisioned by members of the Committee bear no resemblance to the actual adjournment practices of the modern-day Congress, and to accord determinative weight to the Committee's supposed views on whether intersession adjournments prevented return would therefore seriously disserve the larger purpose of the pocket veto clause as understood by the Supreme Court.[36] Given that under the principles of Wright and the Pocket Veto Case, intersession adjournments no longer pose the least obstacle to the President's exercise of his qualified veto, it cannot be dispositive that the Committee of Detail may have believed they would.
 
 
 57
 Appellees point out that the view that intersession adjournments do create an opportunity for a pocket veto has been accepted throughout most of the history of the Republic by both the President and Congress. Brief for the Appellees at 22-29. Beginning with President Jefferson and continuing through President Nixon, twenty-five of the thirty Presidents who have exercised the pocket veto power at all have done so during intersession adjournments. In each of these pocket vetoes--272 in all--Congress has acquiesced. What is more, appellees argue, Congress in 1868 would have codified this practice of acquiescence into law with a bill to limit pocket vetoes to intersession adjournments, were it not for successful objections that so limiting intrasession pocket vetoes would be unconstitutional.
 
 
 58
 Clearly, however, neither the past practice of the Executive nor Congress's acquiescence in that practice is conclusive in this case. See Immigration and Naturalization Service v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 2780-81, 2784, 77 L.Ed.2d 317 (1983). Nor is that practice particularly relevant here, given that it developed under adjournment conditions markedly different from those prevailing today.
 
 
 59
 Appellees raise a final argument in support of the result arrived at by the District Court. Conceding the absence of any practical difference between intrasession and intersession adjournments, they contend that the truly correct "bright line" must be drawn at the three-day mark. Thus, if the tenth day after presentment falls during an adjournment of over three days, a bill that has not yet been returned expires by pocket veto, regardless of the existence of procedures that would ensure actual return to the originating house. Appellees contend that this principle is, in fact, revealed by reading Pocket Veto and Wright together; the former case established the legal irrelevance of procedures that ensure return during the absence of Congress; the latter, it is suggested, declared that the only adjournments that do not prevent return are those of three days or fewer. Appellees also argue that the three-day rule correctly captures the intent of the Framers regarding operation of the pocket veto clause. That clause, they assert, must be read in conjunction with clause 4 of Article I, section 5 of the Constitution, which provides, in part, that "[n]either House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days." Appellees argue that, because every adjournment of over three days is, by the terms of that provision, necessarily either a simultaneous adjournment of both houses or an adjournment of one house pursuant to joint action by both houses, every such adjournment is one by "the Congress." When, therefore, the Framers mandated that an unreturned bill expires if "the Congress by their Adjournment prevent its Return," they must have been referring to all adjournments of over three days.
 
 
 60
 As appellees readily admit, under their interpretation of the pocket veto clause, Kennedy v. Sampson, which denied the use of the pocket veto in all intrasession adjournments of any length, was wrongly decided and should be overruled. Of course, as appellees must also be aware, this panel is not free to reconsider a decision by another panel of this court. Until it is overruled by the full court sitting en banc, Kennedy v. Sampson will remain the law of this circuit. Brewster v. Commissioner, 607 F.2d 1369, 1373 (D.C.Cir.), cert. denied, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979).
 
 
 61
 But even if Sampson had never been decided, we would be compelled to reject appellees' three-day rule, for we cannot agree that any special connection exists between the pocket veto clause and the clause governing adjournments by one house. Indeed, there is strong reason to believe that the Framers intended no such connection whatsoever. The pocket veto clause speaks of adjournment by "the Congress." The phrase "by their Adjournment" by itself plainly refers to any adjournment by Congress, including an adjournment of one day, two days, or three days. Thus, the words of the pocket veto clause cannot support the three-day rule. But neither can reference to clause 4 of Article I, section 5, for that provision relates only to one-house adjournments. Appellees' choice of three days as a bright line thus appears to have no textual grounding at all.
 
 
 62
 Appellees propose the three-day rule, it seems likely to us, because they could not credibly argue for the extreme position that every adjournment by the Congress, no matter how short, creates an opportunity for a valid pocket veto. Such an argument would render nugatory the phrase "prevent its return"; the pocket veto clause would operate as if it read "unless the Congress adjourn, in which case the bill shall not become a law." That reading, in direct contravention to the purpose of the clause, would permit the President an absolute veto whenever Congress is not physically within the walls of the Capitol. Wright, 302 U.S. at 594, 58 S.Ct. at 399. Such an interpretation would also plainly contravene the Supreme Court's statement in Pocket Veto that "the determinative question in reference to an 'adjournment' is ... whether it is one that 'prevents' the President from returning the bill." 279 U.S. at 680, 49 S.Ct. at 466. Only those adjournments that actually prevent return create the opportunity for a pocket veto. Appellees argue that every adjournment of four days or more does precisely that. But the Supreme Court's cases plainly teach us that it is impossible to know whether an adjournment prevents return merely from the fact that it is a particular type of adjournment. Rather, a court must examine the conditions surrounding that type of adjournment and determine whether any obstacle to exercise of the President's qualified veto is posed.[37] To choose a three-day line, or any line, simply because it is a line ignores the Court's mandate and the purpose of the pocket veto clause.
 
 
 63
 The distinction between a three-day adjournment and a four-day adjournment is no more worthy of constitutional significance than is the distinction between modern intrasession and intersession adjournments. Neither distinction finds any support in Article I, section 7, clause 2. Both are arbitrary and frustrate the goal of protecting Congress's right to overrule presidential disapproval without furthering the goal of protecting the President's opportunity to disapprove of legislation. By rejecting these distinctions we do not by any means read the pocket veto clause out of the Constitution. The clause necessarily applies to the final adjournment by a Congress, because under Article I, section 2, clause 1, that Congress has gone permanently out of existence and therefore cannot reconsider a vetoed bill. See Kennedy, supra note 34, at 381. Moreover, we do not hold that intersession adjournments can never prevent return. Congress might someday revoke the existing authority of its agents to receive presidential veto messages, or rescind its rules mandating the carryover of unfinished business from the first session to the second, or resume its early practice of half-year intersession adjournments. In such a case, an intersession adjournment would resemble that involved in the Pocket Veto Case, and that case would unquestionably govern. But the present case is not a second Pocket Veto Case. The existence of an authorized receiver of veto messages, the rules providing for carryover of unfinished business, and the duration of modern intersession adjournments, taken together, satisfy us that when Congress adjourned its first session sine die on the day it presented H.R. 4042 to the President, return of that bill to the originating house was not prevented. We therefore hold that H.R. 4042 became law, and accordingly reverse and remand the decision of the District Court with instructions to enter summary declaratory judgment for appellants.
 
 
 64
 It is so ordered.
 
 BORK, Circuit Judge, dissenting:
 
 65
 The phenomenon of litigation directly between Congress and the President concerning their respective constitutional powers and prerogatives is a recent one. It was unknown through more than a century and three quarters of our jurisprudence--until this court accepted the invitation to umpire such disputes in Kennedy v. Sampson, 511 F.2d 430 (D.C.Cir.1974).
 
 
 66
 This fact alone, the complete novelty of the direct intermediation of the courts in disputes between the President and the Congress, ought to give us pause. When reflection discloses that what we are asked to endorse is a major shift in basic constitutional arrangements, we ought to do more than pause. We ought to renounce outright the whole notion of congressional standing.
 
 
 67
 I write at some length because of the importance of the constitutional issue and because in this case, unlike those in which similar protests have been lodged, the error in analysis produces an error in result. See Vander Jagt v. O'Neill, 699 F.2d 1166, 1177 (D.C.Cir.) (Bork, J., concurring), cert. denied, --- U.S. ----, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983), and Moore v. U.S. House of Representatives, 733 F.2d 946, 956 (D.C.Cir.1984) (Scalia, J., concurring), cert. denied, --- U.S. ----, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985). To date these protests have been unavailing. With a constitutional insouciance impressive to behold, various panels of this court, without approval of the full court, have announced that we have jurisdiction to entertain lawsuits about governmental powers brought by congressmen against Congress or by congressmen against the President. That jurisdiction floats in midair. Any foundations it may once have been thought to possess have long since been swept away by the Supreme Court. More than that, the jurisdiction asserted is flatly inconsistent with the judicial function designed by the Framers of the Constitution.
 
 
 68
 Appellants seek judicial review of a dispute between the Legislative and Executive Branches over the validity of the presidential "pocket veto" as applied to bills presented to the President less than ten days before an intersession adjournment of Congress. The individual appellants--individual members of Congress--allege that they have been injured by this use of the pocket veto because the veto nullified their original votes in favor of the bill in question. The institutional appellants--the Senate and the leadership of the House--allege injury to their "participation in the lawmaking process, since it is the Senate and the House of Representatives that pass legislation under article I, and improper exercise of the pocket veto power infringes that right...." Maj. op. at 26. The majority describes the individual appellants' injury as "a diminution of the ... power to participate in the enactment of legislation through voting on proposed or returned bills," id. at 6 n. 11, and the institutional appellants' injury as "an injury to the lawmaking powers of the two houses of Congress." Id. at 6.
 
 
 69
 It is clear, then, that appellants are suing not because of any personal injury done them but solely to have the courts define and protect their governmental powers. Until this circuit permitted such actions eleven years ago, this suit would have been impossible. Indeed, for most of our history this suit would have been inconceivable. The respective constitutional powers of Congress and the President could have been given judicial definition only when a private party, alleging a concrete injury, actual or threatened, brought those powers necessarily into question. No doubt it appears more "convenient" to let congressmen sue directly and at once; in actuality, that convenience is purchased at the cost of subverting the constitutional roles of our political institutions.[1]
 
 
 70
 Major alterations in the constitutional system can be accomplished through what seem to be minor adjustments in technical doctrine. That is the case here. By according congressmen standing to sue the President, this court proposes a new and much different answer to the question of the proper role of the federal courts in American constitutional disputation. Changing the constitutional role of the federal courts, moreover, necessarily also alters that of Congress and the President, and seems, on the rationale the majority advances, destined to alter that of the States as well. All of these changes work to enhance the power and prestige of the federal judiciary at the expense of those other institutions.
 
 
 71
 Fortunately, the question is not an open one. It is clear upon several lines of analysis that appellants have no standing to litigate the issue they would place before us. Because the significance of what is taking place through this circuit's reshaping of standing doctrine appears to be inadequately appreciated, however, I first undertake to demonstrate that the rationale which underlines congressional standing doctrine also demands that members of the Executive and the Judicial Branches be granted standing to sue when their official powers are allegedly infringed by another branch or by others within the same branch. In addition, states would have standing to protect their powers of governance against the national government on the same theory. The consequences of this expansion of standing, which will bring an enormous number of inter- and intra-government disputes into the federal courts (usually, one supposes, into this physically convenient court) will be nothing short of revolutionary. I next demonstrate that three separate strands of Supreme Court precedent, and the philosophy underlying them, foreclose the possibility of standing here. The criteria articulated by the Supreme Court to govern cases such as this, the argument proceeds, carry out the intentions of the Framers of the Constitution with respect to the role of the federal courts in disputes between or within the political branches. I then show that the aggrandizement of the powers of the judiciary inherent in the doctrine of governmental standing is not made more palatable by the doctrine of "circumscribed equitable discretion" or "remedial discretion" this court has invented precisely to compensate in part for the deficiencies in its standing doctrine. Finally, I explain why the Supreme Court decisions the majority relies upon are inapposite and why we are not, at present, bound by prior decisions of this court that created and sustained the doctrine under review.
 
 I.
 
 72
 The issue of standing is jurisdictional. If a court concludes that a party lacks standing, the court may not proceed to decide the merits of the suit. Though it is sometimes said that standing raises the question whether the party is fit to litigate an issue, whether he has been injured directly so that he possesses "that concrete adverseness which sharpens the presentation of issues," Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), it is clear that much more is involved. The standing requirement, at bottom, has to do with what kinds of interests courts will undertake to protect. As Justice Powell put it in Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975):
 
 
 73
 In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. In both dimensions [standing ] is founded in concern about the proper--and properly limited--role of the courts in a democratic society.
 
 
 74
 (Citations omitted; emphasis added.)
 
 
 75
 This should make it clear that the jurisdictional requirement of standing keeps courts out of areas that are not properly theirs. It is thus an aspect of democratic theory. Questions of jurisdiction are questions of power, power not merely over the case at hand but power over issues and over other branches of government. Article III of the Constitution confers the "judicial Power of the United States" and limits that power in several ways. Among the most important limitations is that expressed in section 2 of article III, confining our jurisdiction to "Cases" and "Controversies." The meaning of those terms, however, is decided by federal courts. It follows that judges can determine the extent of their own power within American government by how they define cases and controversies. It is for this reason that the proper definition of those terms is crucial to the maintenance of the separation of powers that is central to our constitutional structure.
 
 
 76
 "Standing" is one of the concepts courts have evolved to limit their jurisdiction and hence to preserve the separation of powers. A critical aspect of the idea of standing is the definition of the interests that courts are willing to protect through adjudication. A person may have an interest in receiving money supposedly due him under law. Courts routinely regard an injury to that interest as conferring upon that person standing to litigate. Another person may have an equally intensely felt interest in the proper constitutional performance of the United States government. Courts have routinely regarded injury to that interest as not conferring standing to litigate. The difference between the two situations is not the reality or intensity of the injuries felt but a perception that according standing in the latter case would so enhance the power of the courts as to make them the dominant branch of government. There would be no issue of governance that could not at once be brought into the federal courts for conclusive disposition. Every time a court expands the definition of standing, the definition of the interests it is willing to protect through adjudication, the area of judicial dominance grows and the area of democratic rule contracts. That is what is happening in this case. My disagreement with the majority, therefore, is about first principles of constitutionalism.
 
 
 77
 The contours of the standing concept are often fuzzy and ill-defined, but it is not the less fundamental for that. As I wrote in Vander Jagt, 699 F.2d at 1178-79, "[a]ll of the doctrines that cluster about article III--not only standing but mootness, ripeness, political question, and the like--relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government."
 
 
 78
 There may be doubts about what this political-legal idea means for the standing requirement in many cases. This is not such a case. Here it is clear that according these appellants and appellant-intervenors standing is a flat violation of our basic ideas about "the proper--and properly limited--role of the court in a democratic society."
 
 
 79
 The concept of congressional standing, as the majority opinion makes clear, rests upon the idea that members or Houses of Congress must be able to sue to vindicate powers or rights lodged in them by the Constitution. See maj. op. at 25-26, 28. Nothing else is required to confer standing under the doctrine as it has been enunciated by this court. It follows, according to the majority, that appellants have standing to maintain an action against an officer of the Executive Branch to establish that the President's exercise of his pocket veto power was not within the terms set by the Constitution. This may sound unexceptional; it is, in fact, a constitutional upheaval.
 
 
 80
 The first problem with this court's doctrine of congressional standing is that, on the terms of its own rationale, the concept is uncontrollable. Congress is not alone in having governmental powers created or contemplated by the Constitution. This means that the vindication-of-constitutional-powers rationale must confer standing upon the President and the judiciary to sue other branches just as much as it does upon Congress. "Congressional standing" is merely a subset of "governmental standing." This rationale would also confer standing upon states or their legislators, executives, or judges to sue various branches of the federal government. Indeed, no reason appears why the power or duty being vindicated must derive from the Constitution. One would think a legal interest created by statute or regulation would suffice to confer standing upon an agency or official who thought that interest had been invaded.[2]
 
 
 81
 These points become obvious upon examination of the court's doctrine. If this extrapolation of that doctrine at first seems far-fetched, that is only because it points to a new and wholly unfamiliar legal and constitutional world. Yet such a world is precisely what the rationale of the congressional standing doctrine, honestly applied, will create. No avoidance of these implications is possible unless courts lay down fiats, resting upon no discernible principle, that arbitrarily limit those institutions whose members may vindicate constitutional and legal interests. Because the implications of what is being done here are unfamiliar, it will be well to offer a few examples of governmental standing that flow directly from the majority's rationale.
 
 
 82
 We may begin with Congress. Members of Congress, dissatisfied with the President's performance, need no longer proceed, as historically they always have, by oversight hearings, budget restrictions, political struggle, appeals to the electorate, and the like, but may simply come to the district court down the hill from the Capitol and obtain a ruling from a federal judge. The Pocket Veto Case, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929), for example, need not have awaited suit by persons who thought themselves unlawfully deprived of monies: had the congressmen and courts of that time understood what this court now understands, an abstract ruling on the principle of the thing could have been obtained immediately after the President failed to sign the bill. Members of Congress would have standing to sue the President whenever he committed troops, as in Lebanon, on the allegation that there had been a violation of the War Powers Resolution or of Congress' power to declare war under article I, section 8. Members could sue the President about his law enforcement policies and priorities, claiming that their power to make laws under article I, section 8, and his duty, arising under article II, section 3 to "take Care that the Laws be faithfully executed," had both been infringed.[3] Examples of this sort could be multiplied indefinitely.
 
 
 83
 But the transformation this court has wrought in its own powers necessarily runs much farther than that. If Congress, its Houses, or its members can sue the President for a declaration of abstract legal right, it must follow that the President may, by the same token, sue Congress. For example, Presidents at least since Franklin Roosevelt have objected to the device known as the congressional veto on the grounds of its unconstitutionality. Had they understood our constitutional system as this court now understands it, these Presidents need not have waited for a private person to raise the issue in INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), to obtain a declaration of the unconstitutionality of that device, but could have sued Congress at any time. This court may become a potent supplement to the checks and balances the Constitution provides. Under the majority's reasoning, whenever the President vetoes a bill that, in his judgment, requires him to execute an unconstitutional law or invades his legitimate constitutional powers and Congress overrides his veto, the President may sue before the ink is dry for a judicial declaration of unconstitutionality. We will become not only a part of the legislative process but perhaps the most important part.
 
 
 84
 Indeed, if unlawful interference with one's official powers is enough to confer standing I do not know why members of the judiciary should not join in the game, with the added advantage, of course, that one federal judge's lawsuit claiming a right to powers denied would be heard and decided by other federal judges. Thus, when Congress limited the habeas corpus jurisdiction of the District Court for the District of Columbia, there is no reason, under the majority's rationale, why a district court judge, or a judge of this court who had lost appellate jurisdiction, should not have sued Congress and the President for a declaration of unconstitutionality. In this court he would, apparently, have won, see Pressley v. Swain, 515 F.2d 1290 (D.C.Cir.1975) (en banc); Palmore v. Superior Court of the District of Columbia, 515 F.2d 1294 (D.C.Cir.1975) (en banc), though he would not have succeeded in the Supreme Court, see Swain v. Pressley, 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977).
 
 
 85
 Intra-branch disputes also must succumb to this court's plenary interpretation of its own powers. See, e.g., Vander Jagt, 699 F.2d 1166. Individual legislators now have standing to sue each other, the Houses of Congress, other bodies composed of legislators, such as committees and caucuses, and so on. Virtually every internal rule, custom, or practice by which the internal operations of Congress are regulated is reviewable at the discretion of this court at the behest of disgruntled legislators. That means, for example, that the opponents of a filibuster have standing to sue for an injunction directing the filibuster to cease. Legislators who were not selected to serve on the committees of their choice have standing to challenge the manner in which the selection process was conducted. Indeed, this court has so held. Vander Jagt, 699 F.2d at 1170. No matter how intrusive the relief sought, this court has jurisdiction so long as the legislator can show some relationship between the congressional behavior he challenges and his own influence and effectiveness as a legislator. Congress, in short, is subject to judicial oversight to whatever degree this court, exercising its newly-invented powers of equitable discretion, decides supervision is warranted, or, as one of our cases puts it, not "startlingly unattractive." Vander Jagt, 699 F.2d at 1176 (quoting Davids v. Akers, 549 F.2d 120, 123 (9th Cir.1977)). It appears that our constitutional jurisdiction now rests less upon law than upon aesthetic judgments.
 
 
 86
 The same reasoning, of course, applies to disputes within the Executive and Judicial Branches. The head of an agency who believes that another agency has improperly encroached on an area confided to his administration by statute or regulation no longer need bring the dispute before the President, for the courts stand ready to resolve it.[4] Beyond that, a cabinet officer aggrieved by an Executive Order or any other exercise of presidential power, one which arguably requires him to violate an act of Congress, can proceed to challenge the offending directive in federal court, where declaratory judgment and injunctive relief are available to set the President right. Presumably, a district judge whose jurisdiction had been limited by a court of appeals decision could seek rehearing en banc or petition the Supreme Court for a writ of certiorari. According to this court's rationale, I should be able to petition the Supreme Court for a writ of certiorari or of mandamus to overturn the result in this case because it unconstitutionally alters my duties and powers as an article III judge.[5]
 
 
 87
 Nor must it be forgotten that the Constitution contemplates areas of authority for the states, areas in which the national government is not to impinge. Should Congress enact a law that arguably is beyond its powers and that has an impact upon citizens of the several states, it would seem, under this court's reasoning, that members of a state legislature, whose jurisdiction had been ousted, would have standing to sue the national executive to enjoin enforcement of that law. Certainly the State itself would have standing. States, after all, have constitutional functions and powers as surely as Congress does.
 
 
 88
 Enough has been said perhaps to indicate the breathtaking transformation of the judicial function, the relationships between the branches of the national government, and the relationships between federal and state governments that waits at the end of the road upon which this court has set its foot. It is clear from the cases that even this first step is illegitimate.
 
 II.
 
 89
 It is easily demonstrated from several different lines of cases that the doctrine of congressional standing is ruled out by binding Supreme Court precedent. These lines of authority will be examined separately, and I will then suggest that they are but facets of the same set of considerations.
 
 A.
 
 90
 It has been noted already that the rationale upon which the majority accords standing to members of Congress and the Senate in this case would equally permit suits by states to challenge federal laws or actions that seem to impinge upon their sovereignty. But this result, of course, contravenes Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), and does so in a way that shows both the impropriety of the doctrine of governmental standing and the impropriety of that doctrine even if confined, illogically, to suits by congressmen.
 
 
 91
 In Massachusetts v. Mellon, the Commonwealth of Massachusetts brought an original action in the Supreme Court against various federal officials to enjoin, as unconstitutional, enforcement of the Maternity Act. 262 U.S. at 478, 43 S.Ct. at 598. The statute provided appropriations to be apportioned among states that would comply with the law's provisions for the purpose of federal-state cooperation to reduce maternal and infant mortality and protect the health of mothers and infants. Id. at 479, 43 S.Ct. at 598. Massachusetts, in an argument exactly parallel to that the majority advances here, claimed that the Maternity Act was a usurpation of power not granted to Congress, but reserved to the States, by the Constitution. The State asserted standing because its "rights and powers as a sovereign State ... [had] been invaded." Id. The Supreme Court responded that
 
 
 92
 in so far as the case depends upon the assertion of a right on the part of the State to sue in its own behalf we are without jurisdiction. In that aspect of the case we are called upon to adjudicate, not rights of person or property, not rights of dominion over physical domain, not quasi-sovereign rights actually invaded or threatened, but abstract questions of political power, of sovereignty, of government.... [T]his Court is ... without authority to pass abstract opinions upon the constitutionality of acts of Congress ....
 
 
 93
 Id. at 484-85, 43 S.Ct. at 600.
 
 
 94
 In the present case we are asked to pass an abstract opinion upon the constitutionality of an act of the President. Unlike the Supreme Court, the majority here complies with that request. But, if Massachusetts v. Mellon is right, the majority is wrong. If, on the other hand, the majority is right, its rationale would, as already noted, lead to the overruling of Massachusetts v. Mellon, not merely in its general approach, but on the specific situation presented there: all states would have standing to challenge any action by any branch of the federal government even though nothing more concrete than disagreement about constitutional powers was at stake. Since this court is not empowered to overrule Massachusetts v. Mellon,[6] I think the reasoning of that case requires a conclusion that there is no standing here.
 
 B.
 
 95
 The Supreme Court's decisions about suits over "generalized grievances" are closely related to Massachusetts v. Mellon and require the same result here. The merits of the dispute offered us turn upon the interpretation of article I, section 7, clause 2 of the Constitution. That is a task for which courts are suited, and I would have no hesitation in reaching and deciding the substantive question if this were a suit by a private party who had a direct stake in the outcome. The Pocket Veto Case, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929), was, of course, just such a suit.[7] This action, however, is not. This is an action by representatives of people who themselves have no concrete interest in the outcome but only a "generalized grievance" about an allegedly unconstitutional operation of government. It is well settled that citizens, whose interest is here asserted derivatively, would have no standing to maintain this action.[8] That being so, it is impossible that these representatives should have standing that their constituents lack.
 
 
 96
 The Supreme Court has repeatedly rejected the proposition that one who sues as a citizen or taxpayer, alleging nothing more than that the government is acting unconstitutionally, has standing to sue. A naked claim that a constitutional violation has occurred, the Court has said, "would adversely affect only the generalized interest of all citizens in constitutional governance, and that is an abstract injury." Schlesinger v. Reservists Committee To Stop the War, 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974). See United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); Ex parte Levitt, 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937). This is true even though "citizens are the ultimate beneficiaries of those [constitutional] provisions," Reservists, 418 U.S. at 227, 94 S.Ct. at 2935. Taxpayers face the same bar. In Frothingham v. Mellon, 262 U.S. 447, 486, 43 S.Ct. 597, 600, 67 L.Ed. 1078 (1923), the Court denied standing to a federal taxpayer who alleged that a spending bill was unconstitutional. Despite the fact that such bills may have the effect of taking money from the individual taxpayer and putting it to a purpose the Constitution interdicts, the general rule is still that the taxpayer lacks standing because he "suffers in some indefinite way in common with people generally." Id. at 488, 43 S.Ct. at 601. See Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 476-81, 102 S.Ct. 752, 760-63, 70 L.Ed.2d 700 (1982). Thus, these legislators lack standing in their individual, as opposed to their representative, capacities. The majority appears to concede that, insisting only upon representative standing.
 
 
 97
 Yet, the legislators on whom this court has bestowed standing have alleged only two things--an unconstitutional act and an impairment of their constitutional powers as a result of that act. It is clear that the citizens and taxpayers these legislators represent would not have standing if they alleged that the same unconstitutional act had impaired the official powers of their representatives. That would be true despite the fact that citizens and taxpayers are the "ultimate beneficiaries" of the constitutional powers their representatives possess. Indeed, that was precisely the argument that was rejected in Reservists, where the plaintiffs alleged that they, as citizens and taxpayers, had been deprived "of the faithful discharge by members of Congress ... of their duties as members of Congress, to which all citizens and taxpayers are entitled." 418 U.S. at 212, 94 S.Ct. at 2927 (quoting Petition for Certiorari at 46).
 
 
 98
 If the people of the United States would not have standing to bring this action (and it is undeniable that they would not), then how can the representative of the people have standing that their constituents do not? The only possible answer is that elected representatives have a separate private right, akin to a property interest, in the powers of their offices. But that is a notion alien to the concept of a republican form of government. It has always been the theory, and it is more than a metaphor, that a democratic representative holds his office in trust, that he is nothing more nor less than a fiduciary of the people. Indeed, as I show in Part III below, the Framers of the Constitution most certainly did not intend to allow suits such as this, which means they did not conceive of the powers of elected representatives as apart from the powers of the electorate. It is for that reason that Judge Scalia was entirely correct in stating that "no officers of the United States, of whatever Branch, exercise their governmental powers as personal prerogatives in which they have a judicially cognizable private interest. They wield those powers not as private citizens but only through the public office which they hold." Moore, 733 F.2d at 959 (Scalia, J., concurring).
 
 
 99
 Justice Frankfurter's separate opinion in Coleman v. Miller, 307 U.S. 433, 460, 59 S.Ct. 972, 985, 83 L.Ed. 1385 (1939), made the same point on behalf of himself and Justices Black, Roberts, and Douglas:
 
 
 100
 We can only adjudicate an issue as to which there is a claimant before us who has a special, individualized stake in it. One who is merely the self-constituted spokesman of a constitutional point of view can not ask us to pass on it. The Kansas legislators [who challenged the state's ratification of an amendment to the United States Constitution] could not bring suit explicitly on behalf of the people of the United States to determine whether Kansas could still vote for the Child Labor Amendment. They can not gain standing here by having brought such a suit in their own names.
 
 
 101
 Id. at 467, 59 S.Ct. at 988. He said that injuries to voting procedures "pertain to legislators not as individuals but as political representatives executing the legislative process." Id. at 470, 59 S.Ct. at 989. The Court majority did not disagree with this so far as suits in federal courts were concerned, but found an interest sufficient to confer standing only because the suit came from a state court that had found standing under state law. Id. at 446, 59 S.Ct. at 978. Justice Frankfurter's analysis thus remains fully applicable to the action before us now.
 
 
 102
 This court now necessarily adopts as a premise to its reasoning that legislators, and other members of government, have a private individual stake in their official powers that is separate from their fiduciary role. If not, it is utterly anomalous to allow the representative to sue when those he represents may not. One might as well drop the pretense, allow not only legislators but citizens and taxpayers to sue, and declare Richardson, Reservists, and Frothingham overruled and Justice Frankfurter's Coleman analysis rejected. Though the majority does not declare it, that is what it has effectively accomplished for this circuit with the doctrine of congressional standing.
 
 C.
 
 103
 The Supreme Court last Term handed down a decision that makes clear both the foundations of standing doctrine and the utter incompatibility of those foundations with this court's congressional-standing superstructure. In Allen v. Wright, --- U.S. ----, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), Justice O'Connor, writing for the Court majority, restated fundamentals to which we should revert every time an expansion of standing is contemplated.
 
 
 104
 Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies." As the Court explained in Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471-476 [102 S.Ct. 752, 757-760, 70 L.Ed.2d 700] (1982), the "case or controversy" requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded. The several doctrines that have grown up to elaborate that requirement are "founded in concern about the proper--and properly limited--role of the courts in a democratic society." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975).
 
 
 105
 Id. 104 S.Ct. at 3324. She specified the foundations of the doctrine: "the law of Art. III standing is built on a single basic idea--the idea of separation of powers." Id. at 3325. Moreover,
 
 
 106
 the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only "in the last resort, and as a necessity," Chicago & Grand Trunk R. Co. v. Wellman, 143 U.S. 339, 345 [12 S.Ct. 400, 402, 36 L.Ed. 176] (1892), and only when adjudication is "consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process," Flast v. Cohen, 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). See Valley Forge, 454 U.S., at 472-473, 102 S.Ct. at 758-759.
 
 
 107
 Id. The concept of congressional standing, born in this circuit and relied upon by the majority today, is inconsistent with every one of the criteria laid down in this passage from Allen v. Wright.
 
 
 108
 This may be seen by contrasting two opposing conceptions of the role of the federal courts in our polity. The first, and more traditional, view is that federal courts sit to adjudicate disputes between litigants; the power of the courts derives entirely from the necessity to apply the law to concrete controversies. Judges interpret the Constitution and apply it only out of necessity, and as a last resort, because the Constitution is law and may not be ignored by a court of law. In the course of adjudication, the court may have to declare a statute enacted by Congress unconstitutional or it may have to make the same declaration concerning an act of the President. That is an awesome power, but it is confined, limited, and tamed because it is exercised only when the need to decide a concrete controversy makes it inevitable. It is "merely the incidental effect of what Marbury v. Madison took to be the judges' proper business--'solely, to decide on the rights of individuals.' " Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U.L.Rev. 881, 884 (1983) (footnote omitted). This view of the powers of the federal judiciary is the one reiterated by the Supreme Court in Allen v. Wright.
 
 
 109
 Tocqueville understood the genius that underlay this definition of the judicial role:
 
 
 110
 [B]y leaving it to private interest to censure the law, and by intimately uniting the trial of the law with the trial of an individual, legislation is protected from wanton assaults and from the daily aggressions of party spirit. The errors of the legislator are exposed only to meet a real want; and it is always a positive and appreciable fact that must serve as the basis of a prosecution.
 
 
 111
 ....
 
 
 112
 [T]he American judge is brought into the political arena independently on his own will. He judges the law only because he is obliged to judge a case.... It is true that, upon this system, the judicial censorship of the courts of justice over the legislature cannot extend to all laws indiscriminately, inasmuch as some of them can never give rise to that species of contest which is termed a lawsuit .... The Americans have often felt this inconvenience; but they have left the remedy incomplete, lest they should give it an efficacy that might in some cases prove dangerous.
 
 
 113
 1 A. De Tocqueville, Democracy In America 106-07 (T. Bradley ed. 1945).
 
 
 114
 The competing view, which this court adopted with the congressional standing doctrine, is that "the business of the federal courts is correcting constitutional errors, and that 'cases and controversies' are at best convenient vehicles for doing so and at worst nuisances that may be dispensed with when they become obstacles to that transcendent endeavor." Valley Forge, 454 U.S. at 489, 102 S.Ct. at 767. The Valley Forge Court could not have been clearer in rejecting this position: "This philosophy has no place in our constitutional scheme." Id. Yet, by means of its invention of standing for officials or branches of government to seek the continual arbitration of this court in their legal disputes with one another, this court has adopted, as the law of this circuit, the philosophy decisively rejected in Valley Forge and Allen v. Wright.[9]
 
 
 115
 The difference between the two conceptions of the judicial power may be stated more succinctly. In the traditional view, it is the necessity to decide a case that creates a court's duty to "say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). In the new view, it is the court's desire to pronounce upon the law that leads to the necessity to create a case. This is a case created by the court. There would be no case or controversy here but for fabrication of the doctrine of congressional standing.
 
 
 116
 The court has fashioned a doctrine, in contradiction of Allen v. Wright, that transforms it from a tribunal exercising its powers "only in the last resort, and as a necessity" to a governing body for the entire federal government, available upon request to any dissatisfied member of the Legislative, Executive or Judicial Branch. Plainly, the courts of this circuit, if no other, are now not the last but the first resort. We have abandoned concern that our performance be "consistent with a system of separated powers" for a role of continual and pervasive intrusiveness into the relationships of the branches and, indeed, relationships within the branches. Nor can it be said even that the disputes we invite are those "traditionally thought to be capable of resolution through the judicial process," for no one ever thought, until we did, that courts should step directly between the other branches and settle disputes, presented in the abstract, about powers of governance. Moreover, as Alexander M. Bickel said, "the 'standing' and 'case' requirement creates a time lag between legislation and adjudication, as well as shifting the line of vision. Hence it cushions the clash between the Court and any given legislative majority...." A. Bickel, The Least Dangerous Branch 116 (1962). In this respect, the standing requirement is like the requirement of ripeness, another of the traditional aspects of dispute resolution through the judicial process.
 
 
 117
 Congressional standing, which must expand into governmental standing for the President, the judiciary, and the states, if its rationale is honored, completely dispenses with the traditional, limited function of thejudiciary and violates every one of the criteria for constitutional standing laid down by the Supreme Court in Allen v. Wright.
 
 D.
 
 118
 Just as Allen v. Wright teaches that standing requirements are built around the constitutional concept of "separation of powers," Massachusetts v. Mellon suggests that those same requirements also play a vital part in the parallel constitutional concept of federalism. As separation of powers and federalism apply in a context like this one, the fundamental consideration appears to be the need to limit the role of the courts in the interplay of our various governmental institutions. The role of the courts is limited, not excluded, since a person denied a monetary benefit or other concrete interest could invoke the authority of the courts by asserting that a bill had become law because of the invalidity of a pocket veto. The difference between a judicial function limited by the doctrine of standing and one not so limited lies in the relative dominance of the judicial branch, in the timing of judicial action, and in the number of constitutional principles generated that curb the powers and freedoms of other governmental units.
 
 
 119
 As Judge Scalia recently observed, "[t]he degree to which the courts become converted into political forums depends not merely upon what issues they are permitted to address, but also upon when and at whose instance they are permitted to address them." Scalia, supra, 17 Suffolk U.L.Rev. at 892. A federal judiciary that is available on demand to lay down the rules of the powers and duties of other branches and of federal and state governments will quickly become the single, dominant power in our governmental arrangements. The concept of the fragmentation of power, upon which both the ideas of the separation of powers and of federalism rest, will be, if not destroyed, at least very seriously eroded. See generally The Federalist No. 51, at 351 (J. Madison) (J. Cooke ed. 1961) (explaining that both separation of powers and the division of power between state and federal governments serve to protect the liberty of the governed by dividing the power of government). A majority of Supreme Court Justices will have something very like the power to govern the nation by continuously allocating powers and inhibitions to every other governmental institution. As Chief Justice John Marshall put it in a speech to Congress:
 
 
 120
 A case in law or equity was a term well understood, and of limited signification. It was a controversy between parties which had taken a shape for judicial decision. If the judicial power extended to every question under the constitution, it would involve almost every subject proper for legislative discussion and decision; if to every question under the laws and treaties of the United States, it would involve almost every subject on which the executive could act. The division of power which the gentleman had stated, could exist no longer, and the other departments would be swallowed up by the judiciary.
 
 
 121
 Speech of the Honorable John Marshall to the United States House of Representatives, 18 U.S. (5 Wheat.) Appendix at 3, 16 (1820). The concept of standing prevents this undesirable centralization of authority by severely limiting the occasions upon which courts are authorized to lay down the rules for governments and institutions of government.
 
 
 122
 Standing requirements, like the requirement of ripeness, also delay the invocation of judicial power. This means that there is time for the real impact of laws and actions to become clear, thus making the constitutional inquiry less abstract and more focused. The law is given a chance to go into effect and have some impact upon persons in the society so that its constitutionality can be judged according to its real effects upon real persons in real circumstances. The courts are enabled to think about real interests and claims, not words. Constitutional adjudication should operate upon the basis of realities, not general propositions.
 
 
 123
 A firm standing concept also decreases the number of occasions upon which courts will frame constitutional principles to govern the behavior of other branches and of states. There will thus be fewer constitutional principles of that sort in the system. That, too, is a benefit. The business of government is intensely practical and much is accomplished by compromise and accommodation. The powers of the branches with respect to one another, as well as the reciprocal powers of the federal and state governments, ebb and flow as the exigencies of changing circumstances suggest. It is proper and healthful that this should be so. These matters should not be always settled at the outset by declarations of abstract principle from an isolated judiciary not familiar with the very real and multitudinous problems of governing. Fluid relationships should not be frozen and the play removed from the joints of government. That is precisely the tendency that must come into being, however, if elimination of standing requirements permits the explosive proliferation of constitutional declarations about governmental powers.
 
 
 124
 Our democracy requires a mixture of both principle and expediency. As Professor Bickel put the matter:
 
 
 125
 [T]he absolute rule of principle is ... at war with a democratic system....
 
 
 126
 No society, certainly not a large and heterogeneous one, can fail in time to explode if it is deprived of the arts of compromise, if it knows no ways of muddling through. No good society can be unprincipled; and no viable society can be principle-ridden.
 
 
 127
 A. Bickel, supra, at 64. While all branches of government are obliged to honor the Constitution, the declaration of constitutional principle with binding effect is primarily the task of the federal courts. If the federal courts can routinely be brought in to pronounce constitutional principle every time the branches of the federal government disagree, every time the federal and the state governments contend, then we will indeed become a "principle-ridden," in fact a judge-ridden, society. Traditional standing requirements are a principal barrier between us and that unhappy condition.
 
 
 128
 The arguments just made indicate that, except where a conventional lawsuit requires a judicial resolution, much of the allocation of powers is best left to political struggle and compromise. Indeed, it was to facilitate and safeguard such a continuing process that the checks and balances of the Constitution were created. It was to allow room for the evolution of the powers of various offices and branches that the Constitution's specification of those powers was made somewhat vague. The Framers contemplated organic development, not a structure made rigid at the outset by rapid judicial definition of the entire subject as if from a blueprint. The majority finds this plan inadequate and the idea of political struggle between the political branches distasteful, at best "time-consuming," at worst involving "retaliation." Maj. op. at 16. Just so. That is what politics in a democracy is and what it involves. It is absurd to say, as the majority does, that a "political cure seems to us considerably worse than the disease, entailing, as it would, far graver consequences for our constitutional system than does a properly limited judicial power to decide what the Constitution means in a given case." Id. That is a judgment about how the Constitution might better have been written and it is not a judgment this or any other court is free to make. Moreover, I know of no grave consequences for our constitutional system that have flowed from political struggles between Congress and the President. This nation got along with that method of resolving matters between the branches for 185 years, until this court discerned that the nation would be better off if we invented a new role for ourselves. And, of course, it is true that matters of government will be much neater, if less democratic, to the extent that judges undertake to decide them in the first instance. One must not, furthermore, take seriously the majority's promise that this court's congressional standing doctrine "will help to preserve, not defeat, the separation of powers." Maj. op. at 30. As I have shown, there is no principled way to limit the judicial power the majority would have us take for our own, and the result must inevitably lead to the destruction, not the preservation, of the separation of powers.
 
 
 129
 As I show next, those who framed, proposed, and ratified our Constitution chose a different mixture of principle and compromise for our polity, a different process of growth, struggle, and accommodation when they chose the role to be played by courts.
 
 III.
 
 130
 Though we are obligated to comply with Supreme Court precedent, the ultimate source of constitutional legitimacy is compliance with the intentions of those who framed and ratified our Constitution. The doctrine of congressional or governmental standing is doubly pernicious, therefore, because it flouts not only the rules enunciated and applied by the Supreme Court but the historical meaning of our basic document as well. The criteria of Allen v. Wright are not simply Court-made; they reflect and express the design of the Framers of the Constitution. No other conclusion is possible from a consideration of what the Framers did and did not do.
 
 
 131
 At the outset of the Constitutional Convention, Governor Randolph presented a series of resolutions framed by the Virginia delegation and commonly called the Virginia Plan. As Farrand says, "[t]hese resolutions are important, because amended and expanded they were developed step by step until they finally became the constitution of the United States." M. Farrand, The Framing of the Constitution of the United States 68 (1913). The eighth resolution proposed that the new national legislature be controlled by placing a veto power in a Council of Revision consisting of the executive and "a convenient number of the National Judiciary." 1 M. Farrand, The Records of the Federal Convention of 1787, at 21 (1st ed. 1911). A Council so composed would be controlled by the votes of the judiciary, and the latter would in that way heavily influence, and often control, the relationship between the President and Congress. By vetoing or refusing to veto, the judiciary could uphold one branch against the other and make itself the umpire of the constitutional system, not in the last resort or as a necessity, but on a continuing, front-line basis. The judiciary would, as well, be drawn up immediately next to the legislative process and decide what was to be law and what was not on the basis of abstract reasoning, without the benefit conferred by the passage of time, the cooling of passions, and an issue framed in a concrete factual setting.
 
 
 132
 We do not, of course, know all of the reasons why the members of the Convention repeatedly defeated the proposal for a Council of Revision.[10] But we do know the effect the Council would have had upon our constitutional arrangements and upon the role of the courts--effects remarkably similar to those that would result from the final adoption of this circuit's doctrine of governmental standing--and we do know that the idea was rejected.
 
 
 133
 There are, however, more, and stronger, inferences to be drawn from the work of the Convention than merely those that may be drawn from the rejection of the Council of Revision. We know, for example, that the Convention drafted article III of the Constitution in a way that does not contemplate suits directly between the branches of government. Article III extends "judicial power" to various categories of "cases" and "controversies," which itself indicates the Framers had in mind a role for the judiciary similar to the common-law function with which they were familiar. It is perhaps more noteworthy that article III creates, as specific, independent categories of federal judicial power, "controversies" between states, between a state and citizens of another state, and so on. Given that listing, it is incredible that Framers who intended to extend judicial power to direct controversies between Congress and the President failed to include so important a category in their recitation.
 
 
 134
 The drafters, moreover, singled out especially sensitive categories of judicial power for the original jurisdiction of the Supreme Court. Thus, article III gives the Supreme Court original jurisdiction over "all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party." Had they contemplated that the federal courts would regularly supervise relationships between Congress and the President, the Framers would undoubtedly have placed that class of cases within the Supreme Court's original jurisdiction. That inference is made certain by the fact that article III contemplated that "inferior [federal] courts" might not be established at all. In fact, federal question jurisdiction was not given to the lower federal courts for almost a century after the framing of the Constitution. Act of Mar. 3, 1875, ch. 137, Sec. 1, 18 Stat. 470, 470. That fact also demonstrates that the political branches were not to sue each other. The Framers simply cannot have contemplated that disputes directly between Congress and the President would be decided in the first instance in any of the thirteen existing state court systems.
 
 
 135
 It is notorious that the Constitution nowhere mentions any power of judicial review. That fact has been much bruited in the never-ending debate over the legitimacy of the power asserted in Marbury v. Madison. It is entirely conceivable, of course, that Framers who thought the Constitution would be law, and who made it supreme law in article VI of the Constitution, simply assumed that the Constitution would be applied by the courts when cases arose requiring it. Indeed, there are a number of comments preserved from the Convention debates that suggest this is precisely what some members did assume.[11] But it is absolutely inconceivable that Framers who intended the federal courts to arbitrate directly disputes between the President and Congress should have failed to mention that function or to have mentioned judicial review at all. The statesmen who carefully spelled out the functions of Congress and the President and the details of how the executive and legislative branches might check each other could hardly have failed even to mention the judicial lynchpin of the constitutional system they were creating--not if they had even the remotest idea that the judiciary was to play such a central and dominant role.
 
 
 136
 The intentions of the Framers need not be derived entirely from the records of the Constitutional Convention, nor even from the structure and language of the document itself. Courts may and frequently do look to evidence of what was said and done immediately after the original act of composition. Consider, for example, Hamilton's well-known defense of the institution of judicial review in The Federalist No. 78. That defense, in essence, is that the limitations on the constitutional powers of Congress "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the constitution void." The Federalist No. 78, at 524 (A. Hamilton) (J. Cooke ed. 1961). It is important that Hamilton's discussion of judicial review is immediately preceded by a passage in which he repeatedly emphasizes the comparative impotence of the judiciary. The enormous power that the judiciary would acquire from jurisdiction over inter- and intra-branch disputes would have made a mockery of his quotation of Montesquieu to the effect that "of the three powers above mentioned [the others being the legislative and the executive], the JUDICIARY is next to nothing." Id. at 523 n. * (quoting Spirit of Laws, vol. 1, at 186). Had Hamilton even suspected that disagreements between the popular branches over their respective powers were "cases" or "controversies" within the meaning of article III, it is not to be believed that he would have described the judiciary as "from the nature of its functions, ... always ... the least dangerous to the political rights of the constitution...." Id. at 522. In fact, the judiciary would be the branch most dangerous to those political rights.
 
 
 137
 Indeed, the only discussion in The Federalist of possible judicial involvement in disputes between the President and Congress comes in connection with the impeachment power. The problem, Hamilton says, was to create "[a] well constituted court for the trial of impeachments." The Federalist No. 65, at 439 (A. Hamilton) (J. Cooke ed. 1961). He defines that court's jurisdiction in terms of those offenses that derive from "the abuse or violation of some public trust. They are of a nature which may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself." Id. He then considers, and rejects, the proposal that the Supreme Court should have been given this jurisdiction, in part on the grounds that it lacks the independence and authority to discharge this delicate task without a dangerous confrontation with one branch or the other. Id. at 441. The majority's doctrine of congressional standing brings the two political branches before us as adversaries just as much as would giving trials of impeachments to the judiciary. Today's dispute is only over a pocket veto that has little continuing importance, but the invitation we now issue will ultimately bring before us the most profound and agitated issues of politics and government. The task of umpiring disputes between the coordinate branches which this court has agreed to undertake is no more suited to judicial competence than trial by impeachment, and raises the same or greater dangers of repeated and head-on confrontation with the other branches that underlie Hamilton's objections.[12] Thus, the whole tenor of Hamilton's authoritative discussion of the Judicial Branch is completely inconsistent with the existence of the jurisdiction the majority claims to possess.
 
 
 138
 A similar point may be made about Hamilton's discussion of the President's veto power in The Federalist No. 73. Hamilton asserts that the use of the veto power to prevent "the passing of bad laws" was only a secondary purpose of its adoption by the Framers. "The primary inducement to conferring the power in question upon the executive," he says, "is to enable him to defend himself." The Federalist No. 73, at 495 (A. Hamilton) (J. Cooke ed. 1961). The risk is that "he might gradually be stripped of his authorities by successive resolutions or annihilated by a single vote." Id. at 494. Thus, "the case for which the veto power is chiefly designed [is] that of an immediate attack upon the constitutional rights of the executive." Id. at 497. But, if this court's governmental standing doctrine is correct, Hamilton has described a power that is largely superfluous. The President would not need to defend himself through the veto power--he could at once challenge any "vote[s]" or "resolutions" that endangered his "constitutional rights" as President in the courts.
 
 
 139
 Even the Anti-Federalists did not urge the existence of such unbounded judicial power as an objection to the proposed constitution. The most detailed Anti-Federalist critique of judicial review was supplied by the pseudonymous Brutus, whose principal argument was that the federal courts would by constitutional interpretation bring about "an entire subversion of the legislative, executive and judicial powers of the individual states." H. Storing, The Complete Anti-Federalist 2.9.139 (1981). His description of judicial review is revealing: when the legislature enacts laws that the court judges to be unconstitutional, "the court will take no notice of them," and this will discourage the legislature from passing "laws which they know the courts will not execute." Id. at 2.9.148. Had Brutus thought the courts were free not only to refuse to execute an unconstitutional law, but to review it for unconstitutionality where no question of execution had arisen, his argument would have gained immeasurably from some mention of that fact. There is none.
 
 
 140
 It must be concluded, therefore, that those who drafted, proposed, and ratified the Constitution did not intend that the judiciary should entertain suits directly between the political branches of the national government. The judiciary they envisioned was to play no such dominant role in affairs of state. Their intention precludes the doctrine of standing devised by this court to thrust the judiciary into that leading position.
 
 IV.
 
 141
 To make its standing doctrine more palatable this court has adopted a doctrine of remedial or equitable discretion. This doctrine permits the court to say that a congressional plaintiff has standing, and hence that the court has jurisdiction, and yet refuse to hear the case because the court is troubled by the separation-of-powers implications of deciding on the merits. We have no such equitable discretion, however, for "[w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821). By claiming that discretion, the court has created for itself a kind of certiorari jurisdiction--which it took an act of Congress to create for the Supreme Court. There would be no need to violate the settled principle of federal jurisprudence that a court with jurisdiction may not decline it if the article III limits on this court's jurisdiction were adhered to.[13]
 
 
 142
 The introduction of discretion into the standing inquiry is therefore an attempt to change the very nature of that doctrine. Indeed, this court has plainly indicated as much: "The most satisfactory means of translating our separation-of-powers concerns into principled decisionmaking is through a doctrine of circumscribed equitable discretion.... [T]his test avoids the problems engendered by the doctrines of standing, political question, and ripeness." Riegle v. Federal Open Market Committee, 656 F.2d 873, 881 (D.D.Cir.), cert. denied, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981). Indeed it does. The equitable discretion doctrine avoids the problems of standing, political question, and ripeness by ignoring them. But those problems are real; they relate to the properly limited role of the courts in a democratic polity. To avoid them in this way is to say that the limit upon the courts' capacity to intrude upon areas of democratic governance comes not from the Constitution but entirely from the courts' sense of fitness. That is hardly an adequate safeguard. Moreover, this court has no right to avoid the problems of standing. They arise in large part from the Constitution and the Supreme Court has made it abundantly clear, in cases such as Valley Forge and Allen v. Wright, that they must be addressed, and addressed with the separation of powers in mind.[14] The doctrine of remedial discretion removes separation-of-powers considerations from the jurisdictional inquiry and converts them into mere interests to be balanced. Thus, the doctrine relegates separation of powers to second-class status and subordinates the structure of our constitutional system to the discretion of this court. It is impossible for me to view that prospect with equanimity.
 
 
 143
 It is plain on the face of these developments that what we are observing constitutes a major aggrandizement of judicial power. Any lingering doubts on this score are laid to rest by this court's stated presumption in favor of exercising discretion to decide a case when, if a decision on the merits were withheld, "non-frivolous claims of unconstitutional action would go unreviewed by a court." Riegle, 656 F.2d at 882; see also Moore, 733 F.2d at 956; Vander Jagt, 699 F.2d at 1170, 1174 n. 23. The function of the article III case-or-controversy limitations, including the standing requirement, is, however, precisely to ensure that claims of unconstitutional action will go unreviewed by a court when review would undermine our system of separated powers and undo the limits the Constitution places on the power of the federal courts. The Supreme Court has repeatedly said that standing is not "a requirement that must be observed only when satisfied." Valley Forge, 454 U.S. at 489, 102 S.Ct. at 767. See also Reservists, 418 U.S. at 227, 94 S.Ct. at 2935 ("[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing"); Richardson, 418 U.S. at 179, 94 S.Ct. at 2947 ("the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process"). In each of these cases the Court was faced with the contention that if the plaintiff was not permitted to litigate the issue, no one could. In none of those cases did the Court make the response which, if the governmental standing doctrine were correct, would have been most natural, obvious and ready to hand: that, while citizens or taxpayers have no standing to raise abstract claims about the allegedly unconstitutional operation of government, their representatives undoubtedly would. If the doctrine of governmental standing were correct, there would always be some governmental official or entity whose powers were affected by alleged violations of any particular constitutional provision. In Richardson, to take a single example, members of Congress could have sued to force the President to publish the budget of the Central Intelligence Agency, or to force Congress to force the President to do so, on the grounds that they had been denied an opportunity to vote to appropriate or not to appropriate funds for specific CIA programs by virtue of the statute permitting the Agency to account for its expenditures "solely on the certificate of the Director." 50 U.S.C. Sec. 403j(b). A similar analysis would apply to Reservists and Valley Forge. The concession that there are constitutional questions that cannot be litigated because of standing requirements is, therefore, an additional proof that there is no congressional or governmental standing.
 
 
 144
 The limits that standing places upon judicial power do not mean that many important questions of constitutional power will forever escape judicial scrutiny. Many of the constitutional issues that congressional or other governmental plaintiffs could be expected to litigate would in time come before the courts in suits brought by private plaintiffs who had suffered a direct and cognizable injury. That is entirely appropriate, and it belies the argument that this court's governmental standing doctrine is necessary to preserve our basic constitutional arrangements.
 
 
 145
 At bottom, equitable discretion is a lawless doctrine that is the antithesis of the "principled decisionmaking" that was invoked to justify its manufacture. A doctrine of remedial discretion more than "suggests the sort of rudderless adjudication that courts strive to avoid," Vander Jagt, 699 F.2d at 1175--it is rudderless adjudication. A sampling of the cases in which this doctrine has been invoked makes that quite clear. For example, in Riegle the court suggested that the equitable discretion doctrine should apply only to congressional plaintiffs, not to private plaintiffs. 656 F.2d at 881. Indeed, the Riegle court said that the fact that a private plaintiff would have standing to sue would weigh against hearing the congressional plaintiff on the merits, because under those circumstances the unconstitutional action or statute would not go unreviewed. Id. In Vander Jagt, a group of congressmen sued their fellow legislators, and they sued both as congressmen and as individual voters--that is, as private plaintiffs. 699 F.2d at 1167 n. 1. The court held that the plaintiffs had standing both as congressmen and as voters. Id. at 1168, 1169 n. 4. Nonetheless, the court dismissed all the claims because "this case raises separation-of-powers concerns similar to Riegle 's." Id. at 1175. Had it followed Riegle, the Vander Jagt court would have reached the merits of the private plaintiffs' claims--a result I would have found even more objectionable than what the court actually did, see id. at 1183 n. 3 (Bork, J. concurring), but one which would at least have had the virtue of predictability. It is hardly an argument in favor of remedial discretion that whatever standards one panel fashions the next is free to disregard on "equitable" grounds.
 
 
 146
 Ultimately, the doctrine of equitable discretion makes cases turn on nothing more than the sensitivity of a particular trio of judges. One cannot, unfortunately, have any solid grounds for supposing that these aesthetic judgments, though subjective and varying, will at least mark out an irreducible realm of "startling[ ] unattractive[ness]." Vander Jagt, 699 F.2d at 1176. As the spectacle of public officials suing other public officials over abstract constitutional questions becomes familiar, the taint will wear off, and what seemed unattractive will appear inevitable. Alexander Pope's dictum, though grown trite, is too apt to ignore: "Vice is a monster of so frightful mien/As to be hated needs but to be seen;/ Yet seen too oft, familiar with her face,/ We first endure, then pity, then embrace." An Essay on Man, Epistle II, 1. 217. The combination of congressional standing and equitable discretion will very probably prove to have been but a way-station to general, continual, and intrusive judicial superintendence of the other institutions in which the Framers chose to place the business of governing.
 
 V.
 
 147
 The majority maintains that its holding that appellants have standing is supported by decisions of the Supreme Court and required by binding precedent in this circuit. Neither of those claims withstands analysis.
 
 A.
 
 148
 The principal Supreme Court decisions the majority deploys in support of its position are Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939); United States v. ICC, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949); Chapman v. FPC, 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953); Nixon v. Administrator of General Services, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); and INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). An inspection of these cases, however, reveals that they do not support the revolutionary proposition for which they are conscripted.
 
 
 149
 The majority states that Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), proves that "a claim that is founded on a specific and concrete harm to [lawmaking] powers" is "judicially cognizable." Maj. op. at 28. Coleman proves nothing of the kind. But the case is not merely inapposite to the point for which the majority cites it. In fact, the Supreme Court's reasoning affirmatively demonstrates that the majority is wrong and that the appellants before us have no standing to maintain this action.
 
 
 150
 In Coleman, a group of Kansas State Senators who had voted to reject a proposed amendment to the federal Constitution challenged in the state courts the validity of the Lieutenant Governor's tie-breaking vote in favor of ratification. 307 U.S. at 436, 59 S.Ct. at 974. The Supreme Court found that they had standing, upon a grant of certiorari, to contest the merits of an adverse decision by the Kansas Supreme Court. But Chief Justice Hughes' opinion for the majority made it clear that the Court accorded standing to obtain review of a federal constitutional question only because there existed a legal interest accepted as sufficient for standing by the highest state court. Thus, the opinion held that the state senators had "an interest in the controversy which, treated by the state court as a basis for entertaining and deciding the federal questions, is sufficient to give the Court jurisdiction to review that decision." Id. at 446, 59 S.Ct. at 978 (emphasis added).
 
 
 151
 The critical importance of state court standing to obtain federal constitutional review was made even clearer by the distinction the Chief Justice drew between Leser v. Garnett, 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 (1922), and Fairchild v. Hughes, 258 U.S. 126, 42 S.Ct. 274, 66 L.Ed. 499 (1922). Both cases involved suits by citizens to have the nineteenth amendment declared not a part of the Constitution. The only difference between the cases relevant to the standing issue was that Leser was brought in the Maryland courts and Fairchild was brought in a federal court.[15] As the Chief Justice pointed out, the Supreme Court on the same day in opinions written by the Jame Justice (Brandeis, J.) took jurisdiction over the Maryland case, stating that the laws of Maryland authorized the suit, but held that the federal court was without jurisdiction because plaintiffs, having only a general interest in government according to law, an interest possessed by every citizen, had no standing. 307 U.S. at 440, 59 S.Ct. at 976.
 
 
 152
 Justice Frankfurter wrote separately for himself and three other Justices to deny that the plaintiffs in Coleman had standing. Frankfurter clearly thought that a legislator's interest in his official powers could not confer standing in federal courts because such interests were not "matters of 'private damage.' " 307 U.S. at 470, 59 S.Ct. at 989. He expressly disagreed with the idea that standing under Kansas law could confer standing in the United States Supreme Court. See id. at 465-66, 59 S.Ct. at 987. He thus rejected the distinction made by Leser and Fairchild and adopted by Chief Justice Hughes in Coleman.[16] The Court majority's adoption of that distinction shows not only that Coleman's finding of standing is confined to cases where states recognize standing in their own courts but demonstrates also that the same plaintiffs would not have standing in a federal court. All nine Justices in Coleman agreed to the latter proposition. The case before us was brought in a federal court. Coleman proves, therefore, that the plaintiffs here have no standing. It is, to say the least, distinctly peculiar that the majority cites the case for its own contrary conclusion.
 
 
 153
 The majority draws from United States v. ICC the proposition that courts may not avoid justiciable controversies "simply because one or both parties are coordinate branches of the government." Maj. op. at 27. In whatever limited sense this statement may be true, it has no application where the only alleged basis for the plaintiff's standing is its powers as one of the contending branches, and hence the statement is not relevant to the present case. This is a suit in which the standing of appellants rests exclusively on an alleged impairment of their respective governmental powers. United States v. ICC was not that at all. Though the government was appealing an order of the ICC, its real opponents were railroads from which it sought reparations in its proprietary, not its governmental, capacity. 337 U.S. at 428, 69 S.Ct. at 1412. Thus the government's standing did not rest on impairment of governmental powers. As the Court said, "[t]he basic question is whether railroads have illegally exacted sums of money from the United States." Id. at 430, 69 S.Ct. at 1413. Moreover, because the railroads were present as "the real parties in interest," id. at 432, 69 S.Ct. at 1414, the situation in United States v. ICC was essentially the same as when the United States petitions for a writ of mandamus directed to a district court. Despite the district judge's name on the petition, the real adversary is the party on the other side of the litigation. It is not an action by the Executive Branch against part of the Judicial Branch to determine their respective governmental powers. So, too, United States v. ICC was not a suit by the Executive Branch against an independent agency over their respective governmental powers.
 
 
 154
 Furthermore, because the ICC is an independent agency, the President had no power to terminate the controversy by ordering the ICC to reverse its decision denying the government money damages. See infra at pp. 65-66. That fact constitutes an additional reason for the Court's conclusion (which the Court rested on the presence of a dispute between the government and the railroads, see 337 U.S. at 430-31, 69 S.Ct. at 1413) that "the established principle that a person cannot create a justiciable controversy against himself has no application here." Id. at 431, 69 S.Ct. at 1413. It also suggests that the government's standing might not have been sustained by the Court but for the ICC's status as an independent agency.
 
 
 155
 In Chapman, which the majority construes as allowing standing based on infringement of governmental powers, see maj. op. at 25, the Secretary of the Interior and an association of rural electric cooperatives challenged the FPC's issuance of a license to a power company to build a hydroelectric station at a site that Congress allegedly "reserved ... for public development and so has placed ... beyond the licensing power of the Federal Power Commission." 345 U.S. at 156, 73 S.Ct. at 612. The Secretary claimed that both his general duties relating to conservation of water resources and his "specific interest" in fulfilling his statutory duty to market public hydroelectric power were "adversely affected by the Commission's order." Id. The Court neither endorsed nor repudiated that argument. Its entire discussion of standing reads as follows:
 
 
 156
 We hold that petitioners have standing. Differences of view, however, preclude a single opinion of the Court as to both petitioners. It would not further clarification of this complicated specialty of federal jurisdiction, the solution of whose problems is in any event more or less determined by the specific circumstances of individual situations, to set out the divergent grounds in support of standing in these cases.
 
 
 157
 Id.
 
 
 158
 It is hard to imagine a holding more confined to its facts--for the Court supplied no rationale for its decision. But, to begin with, we may observe that in Chapman there were private parties on both sides of the dispute, the one defending its right to the license it had been granted by the Commission, the other claiming that its right to a preference in sales of surplus power by the Secretary had been impaired. Since the court held that the electric cooperatives had been aggrieved, within the meaning of 16 U.S.C. Sec. 8252, by the Commission's action, its parallel holding as to the Secretary, who had been allowed to intervene in administrative proceedings before the Commission, see United States v. FPC, 191 F.2d 796, 799 (4th Cir.1951), was not strictly necessary to decide the merits.
 
 
 159
 Furthermore, because the site was clearly within the public domain,[17] the Court may have agreed with the lower court that "the United States, representing the people of the country, may have an interest in the construction of a power project," United States v. FPC, 191 F.2d at 800, while disagreeing with the lower court's contention that that fact "does not confer upon the Secretary of the Interior any authority to go into court for its protection." Id. That would make Chapman an instance in which the Secretary was allowed to sue on behalf of the United States over the federal proprietary interest in a site within the public domain. In this connection, it is striking that the lower court in Chapman read United States v. ICC as "hold[ing] merely that suit by the United States to protect its interests is not precluded merely because the suit must be brought against a governmental agency. Nothing is said to indicate that an officer of the government may go into court against such agency to protect the public's interest with respect to a matter as to which he is charged with no duty or responsibility." Id. Thus, Chapman may have turned simply on whether or not the Secretary was in fact charged with the duty of representing the United States' property interest in such matters--in which event, it is clear that had the Secretary not been a proper party, the Solicitor General would have been. As in United States v. ICC, then, standing was in all likelihood based on the government's proprietary interests rather than on infringement of the Secretary's governmental powers.
 
 
 160
 That suit by some member of the executive branch was appropriate is also clear, because Chapman involved neither an inter- nor intra-branch dispute. The FPC was created as an independent agency. See 16 U.S.C. Sec. 792 (1982) (Commissioners appointed by President by and with the advice of the Senate for terms of five years); see also 44 U.S.C. Sec. 3502(10) (1982) (listing the Federal Energy Regulatory Commission (the successor to the FPC) as an "independent regulatory agency"). Among other things, that means that the Commissioners are "officer[s] who occupy no place in the executive department and who exercise[ ] no part of the executive power vested by the Constitution in the President." Humphrey's Executor v. United States, 295 U.S. 602, 628, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935). The dispute in Chapman, then, was a dispute between the Executive Branch and an agency outside the Executive Branch. That agency was a creature of Congress, charged with substantial independent responsibility and given substantial delegated powers, but not itself a coordinate branch. A solution to the dispute was not within the legal control of the President. For although no statute expressly denies that a Federal Power Commissioner can be removed by the President without cause, it is clear from the regulatory and adjudicative functions of the Commission that, as in Weiner v. United States, 357 U.S. 349, 356, 78 S.Ct. 1275, 1279, 2 L.Ed.2d 1377 (1958), "we are compelled to conclude that no such power is given to the President directly by the Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it." Since, under the rationale of Humphrey's Executor, the President could not order the Commission to comply with the Executive Branch's view of the public interest, a suit by the government in its proprietary capacity was the necessary means of resolving the dispute, and was clearly allowable under United States v. ICC.
 
 
 161
 It may be, then, that the fact that the Executive's dispute was with an independent agency was regarded by some Justices as sufficient to confer standing. It may be that some Justices were persuaded by the presence of a private party claiming a property right that the Secretary wished to extinguish. In this respect, too, Chapman parallels United States v. ICC. We cannot know the rationales of the various Justices, but there is certainly no basis for using an unexplained case as the reason for creating a general rule of standing for all branches and members of branches to assert their legal rights directly against one another when it is clear that such a general rule is contrary to article III and Supreme Court precedent.
 
 
 162
 The majority claims that Nixon v. Administrator of General Services, 433 U.S. 425, 439, 97 S.Ct. 2777, 2788, 53 L.Ed.2d 867 (1977), "indicat[es] that [an] incumbent President would 'be heard to assert' [a] claim that [a statute] unconstitutionally impinges upon the autonomy of the Executive Branch." Maj. op. at 25. The majority supposes that this means the President would have standing to sue because his governmental powers had been invaded without any other injury. That is an astonishing inference to draw from a decision that has absolutely nothing to do with governmental standing and does not in any way suggest that the President could sue Congress or one of his own subordinates in the Executive Branch to defend his constitutional powers.
 
 
 163
 Former President Nixon's standing to challenge the constitutionality of the Presidential Recordings and Materials Preservation Act rested upon his allegation that the statute disposed of materials that were his personal property. 433 U.S. at 431, 435-36, 97 S.Ct. at 2784, 2786. He raised the constitutional prerogatives of the presidency not as a basis for standing but as grounds of substantive law that invalidated the Act. The situation was no different than when any private plaintiff who has standing because of a threat to his property advances a constitutional contention on the merits of the dispute.
 
 
 164
 The majority has apparently misinterpreted the Court's rejection of an argument that the former President could not rely upon rights pertaining to an incumbent President. This was a jus tertii argument--that, for prudential reasons, the federal courts should not allow a plaintiff to challenge the constitutionality of a statute on the grounds that it infringes the constitutional rights of others. See generally Valley Forge, 454 U.S. at 474, 102 S.Ct. at 759; Singleton v. Wulff, 428 U.S. 106, 113-14, 96 S.Ct. 2868, 2873-74, 49 L.Ed.2d 826 (1976). Thus, the passage the majority cites from Nixon v. Administrator states only: "We reject the argument that only an incumbent President may assert such claims [of separation of powers and the presidential privilege of confidentiality] and hold that appellant, as a former President, may also be heard to assert them." 433 U.S. at 439, 97 S.Ct. at 2788. It is far-fetched enough to infer from this that the Court was saying an incumbent President could sue Congress directly, but the inference disappears without a trace when it is realized that this was a jus tertii discussion and that the Court was not even remotely concerned with an impingement on the autonomy of the Executive Branch as a basis for standing. Nixon v. Administrator lends the majority no support whatever.
 
 
 165
 The majority also makes the untenable claim that INS v. Chadha indicates that Congress has a judicially cognizable interest in vindicating its constitutional powers. In Chadha, the INS, the executive agency charged with enforcing the immigration laws, agreed with Chadha that the legislative veto authorized by section 244(c)(2) of the Immigration and Nationality Act, 8 U.S.C. Sec. 1254(c)(2) (1982), was unconstitutional. 103 S.Ct. at 2772. Agreeing that under these circumstances the court of appeals had rightly allowed both Houses of Congress to intervene, the Court said: "We have long held that Congress is the proper party to defend the validity of a statute when an agency of government, as a defendant charged with enforcing the statute, agrees with plaintiffs that the statute is inapplicable or unconstitutional. See Cheng Fan Kwok v. INS, [392 U.S. 206], 210 n. 9 [88 S.Ct. 1970, 1973 n. 9, 20 L.Ed.2d 1037 [ (1968) ]; United States v. Lovett, 328 U.S. 303 [66 S.Ct. 1073, 90 L.Ed. 1252] (1946)." 103 S.Ct. at 2778. There was, in Chadha as in the cases the Court cited, an aggrieved individual who sought relief that ran only against the Executive Branch: that satisfied the injury-in-fact, causation, and redressability requirements of article III. Indeed, the Court specifically held that "prior to Congress' intervention, there was adequate Art. III adverseness even though the only parties were the INS and Chadha." Id. Although the INS agreed that the statute requiring it to deport Chadha was unconstitutional, but for the court of appeals' ruling to that effect, the INS would have deported Chadha. Id. Congress, though nominally a party, was in reality much more in the position of an amicus curiae. No judgment could be entered against Congress, whose position as an intervenor differed from status as an amicus only in the ability to petition for certiorari. Congress' intervention, in other words, merely heightened the "concrete adverseness" of what was already a case-or-controversy. It is a far cry from that carefully limited holding to saying that Congress suffers a judicially cognizable injury when its lawmaking powers are infringed. See maj. op. at 28.
 
 
 166
 The foregoing analysis demonstrates, I think, that the cases relied upon by the majority lend it no support and that some of them show its positions to be wrong. But if a construction seemingly favorable to the majority's doctrine of general governmental standing could somehow be tortured out of one of these or some other cases, those decisions would remain anomalies and exceptions that should not be used to construct general doctrine. If we begin to generalize from aberrations, taking as our model the abnormal, we will ultimately produce not a natural but a deformed thing, a doctrine that is not Jekyll but Hyde; and that is what is being built in this circuit, a constitutional monstrosity. Constitutional doctrine should continually be checked not just against words in prior opinions but against basic constitutional philosophy. When that is done it becomes plain, as I have already shown, that the doctrine of congressional, and hence of governmental, standing has no legitimate place in our jurisprudence.
 
 B.
 
 167
 It is also not the case that binding precedent in this circuit requires us to hold that appellants have standing. The majority rests this conclusion on Kennedy v. Sampson, 511 F.2d 430 (D.C.Cir.1974), and Moore v. U.S. House of Representatives, 733 F.2d 946 (D.C.Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985). See maj. op. at 25, 26 n. 13. That, I think, will clearly not do. In Kennedy, this court held that a senator had standing to challenge the legality of an intrasession pocket veto because the veto nullified his vote on the bill to which it applied. In reaching that holding, the Kennedy court nowhere addressed the separation-of-powers considerations that pervade the standing inquiry as articulated and applied in subsequent Supreme Court cases, notably Valley Forge and Allen v. Wright. The Kennedy Court's discussion of article III standing turned exclusively on a party's fitness to litigate and did not depend on separation-of-powers considerations. 511 F.2d at 433. That view of standing had been endorsed by the Supreme Court a few years before Kennedy was decided. See Flast v. Cohen, 392 U.S. 83, 100-01, 88 S.Ct. 1942, 1952-53, 20 L.Ed.2d 947 (1968). But Flast's view of standing has proved to be an aberration, for divorcing standing from separation-of-powers considerations inexorably leads to successive accretions to the power of the federal judiciary, a result the Framers certainly did not intend. Valley Forge and Allen v. Wright demonstrate that the Court, reversing the course it took in Flast, has restored separation-of-powers considerations as the central premise of the constitutional standing requirement. These recent Supreme Court decisions are flatly inconsistent with the method of analyzing the standing of congressional plaintiffs the Kennedy court employed. At a minimum, therefore, we are bound to abandon Kennedy's rationale, and any reaffirmation of Kennedy, to be valid, must rest on a different standing analysis.
 
 
 168
 In view of the virtual identity, for purposes of standing analysis, between Kennedy and the litigation now before us, an effort to supply an alternative basis for Kennedy's result is essential if Kennedy is to continue to be regarded as binding precedent.[18] Indeed, because none of this court's congressional standing cases, including Moore, rests on the premise that separation-of-powers considerations must inform the article III standing inquiry, those cases cannot possibly be binding precedent.[19]
 
 
 169
 Although the majority views Kennedy and Moore as binding precedent, it offers no real defense of the standing analysis employed in those cases, or of the equitable discretion doctrine itself. Instead, the majority suggests that it need not consider the doctrine of equitable discretion here because that doctrine applies only to "actions by individual congressmen whose real grievance consists of their having failed to persuade their fellow legislators of their point of view, and who seek the court's aid in overturning the results of the legislative process." Maj. op. at 28.
 
 
 170
 Thus the court now holds, for the first time, that Congress, or either of its Houses, has standing to sue the President for allegedly infringing its lawmaking powers, and that even the limited prudential role that the equitable discretion doctrine assigns to separation-of-powers considerations is inapplicable in such cases. That is tantamount to adopting a per se rule that Congress has standing to sue the President whenever it plausibly alleges an actual impairment of its lawmaking powers. But if Congress may sue under these circumstances, it should follow that a congressional plaintiff may sue whenever he plausibly alleges an actual impairment of his lawmaking powers. The harm, in each case, is of the same kind--an injury to lawmaking powers. Kennedy stated in dictum that the injury suffered by Congress was "direct," while the injury suffered by an individual member of Congress was "derivative" and "indirect." 511 F.2d at 435, 436. But that distinction has consistently been treated as immaterial in this court's congressional standing cases, and the majority does not purport to rely on it now. That is quite understandable, for once impairment of governmental powers is deemed sufficient to confer standing it is obvious that an individual member of Congress suffers immediately rather than remotely, as those concepts are employed in the causation branch of the article III standing inquiry. Moreover, the harm to an individual legislator is much greater, for his ability to engage in political struggle with the President is far less than the ability of an entire House or of the entire Congress. The majority, if it applied the rationale for its per se rule consistently, would therefore abandon the equitable discretion doctrine altogether.
 
 
 171
 Instead, the majority confines that doctrine to cases in which the court believes that congressional plaintiffs are not attempting to "overturn[ ] the results of the legislative process." Maj. op. at 28. The legislative process, of course, is implicitly and quite arbitrarily defined as a process that ends when "Congress has passed an Act." Maj. op. at 28. That was far from obvious to the Framers, who debated at some length whether the veto improperly gave the Executive a share in legislative power. See, e.g., 2 M. Farrand, The Records of the Federal Convention of 1787, at 73-80 (1st ed. 1911). Thus, The Federalist had to defend the President's qualified veto power against the charge that it violated the principle of separation of powers. That defense took the form, not of denial that the veto power was a legislative power, but of an argument that separation of powers was not an absolutist principle, but one which was "entirely compatible with a partial intermixture of those departments for special purposes, preserving them, in the main, distinct and unconnected." The Federalist No. 66, at 445, 446 (A. Hamilton) (J. Cooke ed. 1961) (applying this reasoning to the Senate's power to try impeachments and to the President's veto power). See also 2 M. Farrand, supra, at 75 (remarks of Gerry) (arguing against the Council of Revision on the grounds that "[i]t was making the Expositors of the Laws [the Judiciary], the Legislators which ought never to be done"); id. (remarks of Gouverneur Morris) (responding to Gerry with the observation that "the Judges in England had a great share in ye Legislation"). Would the majority contend that the Vice-President's tie-breaking vote is not part of the legislative process? Of course, if the alternative definition of the legislative process as including the veto (and, on the same reasoning, the pocket veto) were accepted, it would follow, on the majority's own reasoning, that neither Congress nor the congressional plaintiffs have standing to bring this action, for they would, on that definition, be attempting to overturn the results of the legislative process.
 
 
 172
 Apart from that, the majority offers no explanation of why a legislator who has "failed to persuade [his] fellow legislators" to enact a bill should be treated differently from a legislator who has failed to persuade them to reenact the bill to which the "pocket veto" had been applied. If "the principle that a legislator must lack collegial or 'in-house' remedies before this court will confer standing," Riegle, 656 F.2d at 879, is, as the majority appears to think, the sole basis for the equitable discretion doctrine, and if that principle is applied consistently, then the equitable discretion doctrine must be applied to the congressional plaintiffs in the suit before us today. That being true, the doctrine of equitable discretion should have barred the suit by Senator Kennedy in Kennedy v. Sampson: as the Riegle court pointed out, he "had collegial remedies ...; Senator Kennedy's power to reintroduce the relevant legislation in the next session of Congress and to vote thereon remained unimpaired." 656 F.2d at 880. The principle, moreover, would seem to apply even more strongly to Congress itself--for Congress surely is in a better position to reenact the vetoed bill than is any congressional plaintiff. One can therefore as easily derive from the majority's arguments the proposition that neither Congress nor the congressional plaintiffs are properly before us as the proposition that each is properly before us. That is a fitting commentary on the coherence of this court's governmental standing doctrine.
 
 
 173
 The majority's position is also inconsistent with the treatment of the equitable discretion doctrine in Riegle, which first invoked that doctrine. In Riegle, a panel of this court said that "[w]hen a congressional plaintiff brings a suit involving circumstances in which legislative redress is not available or a private plaintiff would likely not qualify for standing, the court would be counseled under our [equitable discretion] standard to hear the case." 656 F.2d at 882.[20] Thus, the Riegle court justified the result in Kennedy v. Sampson (which it had already explained as a case in which legislative redress was available) on the grounds that in that case a private party would not have had standing to challenge the pocket veto. See id. In this suit, as in Kennedy, we have before us legislators who could obtain legislative redress. If the majority were applying Riegle, it would therefore dismiss the action by the individual appellants in their capacity as legislators, unless it determined that a similar action could not be brought by a private plaintiff. Since the legislators here are also suing in their individual capacities, there would seem no excuse for not making that determination. If the majority believes that Riegle is no longer good law, it should say so, in order that our district courts may at least know what the law in this circuit is--however uncomfortable it may be to apply.[21]
 
 
 174
 It is clear, then, that neither Supreme Court precedent nor binding precedent in this circuit supports what the majority does today.
 
 VI.
 
 175
 It is rather late in our history for courts to rearrange fundamental constitutional structures. But, even if one hypothesizes that to be proper in some small class of cases, and I do not, nonetheless, shifts in the constitutional relationships of the three branches of government should be examined carefully to determine whether they are legitimate. That, of course, depends on whether these shifts represent the working out of implications already inherent in real constitutional principles or whether they are mere innovations, reflecting perhaps no more than the tendency of the judiciary, not least of this court, to expand its authority in a mood of omnicompetence. It seems plain that the creation of congressional (and hence of general governmental) standing falls into the latter category.
 
 
 176
 The legitimacy, and thus the priceless safeguards of the American tradition of judicial review may decline precipitously if such innovations are allowed to take hold.
 
 
 177
 [W]e risk a progressive impairment of the effectiveness of the federal courts if their limited resources are diverted increasingly from their historic role to the resolution of public-interest suits brought by litigants who cannot distinguish themselves from all taxpayers or all citizens. The irreplaceable value of the power articulated by Mr. Chief Justice Marshall lies in the protection it has afforded the constitutional rights and liberties of individual citizens and minority groups against oppressive or discriminatory government action. It is this role, not some amorphous general supervision of the operations of government, that has maintained public esteem for the federal courts and has permitted the peaceful coexistence of the countermajoritarian implications of judicial review and the democratic principles upon which our Federal Government in the final analysis rests.
 
 
 178
 United States v. Richardson, 418 U.S. 166, 192, 94 S.Ct. 2940, 2954, 41 L.Ed.2d 678 (1974) (Powell, J., concurring). Yet when federal courts approach the brink of "general supervision of the operations of government," as they do here, the eventual outcome may be even more calamitous than the loss of judicial protection of our liberties. Gradually inured to a judiciary that spreads its powers to ever more aspects of governance, the people and their representatives may come to accept courts that usurp powers not given by the Constitution, courts that substitute their discretion for that of the people's representatives. Perhaps this outcome is also the more likely of the two because excesses such as this court's governmental standing rationale, shrouded as they are in technical doctrine, are not so visible as to excite alarm. This case represents a drastic rearrangement of constitutional structures, one that results in an enormous and uncontrollable expansion of judicial power. I have tried to make that fact visible. There is not one shred of support for what the majority has done, not in the Constitution, in case law, in logic, or in any proper conception of the relationship of courts to democracy. I have tried to make that fact visible, too.
 
 
 179
 I dissent.
 
 
 
 [1]
 Barnes v. Carmen, 582 F.Supp. 163 (D.D.C.1984)
 
 
 [2]
 They have sued both in their individual capacities and as members of the House. Thirty-one of the thirty-three members voted in favor of the legislation in question; two took no part in the measure's final adoption on the floor. 582 F.Supp. at 164
 
 
 [3]
 The Senate intervened in the District Court pursuant to FED.R.CIV.P. 24(a)(1) and 2 U.S.C. Secs. 288b(c), 288e(a), 288l(a) (1982). The resolution directing Senate Legal Counsel to undertake intervention was jointly sponsored by Senators Howard Baker and Robert Byrd, Majority and Minority Leaders, respectively, of the Senate. S.Res. 313, 98th Cong., 2d Sess. (1984); 130 CONG.REC. S223-24 (daily ed. Jan. 26, 1984) (remarks of Sen. Baker). The Speaker of the House of Representatives and the House Bipartisan Leadership Group, which includes the Majority and Minority Leaders and Whips, intervened in their official capacities pursuant to FED.R.CIV.P. 24(a)(2), or in the alternative under FED.R.CIV.P. 24(b)(2). All applications of intervention were granted without opposition in the District Court, 582 F.Supp. at 164 n. 1
 
 
 [4]
 Mr. Kline has been substituted for his predecessor, Gerald P. Carmen, who was the General Services Administration defendant in the District Court
 
 
 [5]
 "Intersession" adjournments separate the first and second sessions of each Congress, in contrast to "intrasession" adjournments (those within a session) and "final" adjournments (those at the end of a Congress)
 
 
 [6]
 Those requirements made semi-annual certification by the President that El Salvador is progressing in protecting human rights a pre-condition to continued military aid to the government of that country. ISDCA Sec. 728(b)-(e). H.R. 4042 sought to extend those requirements through fiscal year 1984 or until Congress enacted new legislation governing the subject. H.R. 4042, 98th Cong., 1st Sess., 129 CONG.REC. H7777 (daily ed. Sept. 30, 1983). Under the bill, the President was required to make certification on January 16, 1984, and again 180 days thereafter. See Joint Brief for the Plaintiff-Appellants and Senate Intervenor-Appellant at 5 n. 2
 
 
 [7]
 129 CONG.REC. H10,469, S16,779 (daily ed. Nov. 18, 1983). Although the duration of a sine die adjournment is by definition unspecified, Congress in this instance followed its usual end-of-session practice of vesting joint authority in the Speaker of the House and the Majority Leader of the Senate to reassemble the Congress "whenever, in their opinion, the public interest shall warrant it." H.Con.Res. 221, Sec. 2, 98th Cong., 1st Sess., 129 CONG.REC. H10,105 (daily ed. Nov. 16, 1983); id. at S16,858 (daily ed. Nov. 18, 1983)
 
 
 [8]
 H.J.Res. 421, 98th Cong., 1st Sess., 129 CONG.REC. H10,105 (daily ed. Nov. 16, 1983); id. at S16,858 (daily ed. Nov. 18, 1983). The Ninety-eighth Congress convened its second session as scheduled on January 23, 1984
 
 
 [9]
 Appellants accordingly take the position that the merits aspect of Kennedy v. Sampson was incorrectly decided. See Brief for the Appellees at 57-63
 
 
 [10]
 Since the appeal was filed, Congress passed, and the President signed, a supplemental appropriations bill, Pub.L. No. 78-332, which approved disbursement of certain funds for military assistance to El Salvador upon the President's meeting certification requirements that differ somewhat from those imposed by H.R. 4042. See Supplemental Brief for the Plaintiff-Appellants and Senate Intervenor-Appellant. Because the new law supersedes H.R. 4042 only with respect to the particular funds appropriated thereunder, and because Congress may make further appropriations to which the certification requirements of H.R. 4042 might apply if that bill became law, a live controversy remains for us to resolve
 
 
 [11]
 511 F.2d at 433-36. The Senator himself characterized the injury as a deprivation of his constitutional prerogative of voting to override the President's veto. Id. at 434 n. 13. The court noted that, strictly speaking, the opportunity to override never arose because the President had not attempted a return veto. Id. Under either characterization, however, the result of the President's inaction was a diminution of the Senator's power to participate in the enactment of legislation through voting on proposed or returned bills. See id. at 435-36
 
 
 [12]
 The Senate has intervened in this action to protect "a direct constitutional interest in the efficacy of its legislative action," see Motion of the United States Senate to Intervene at 2, Barnes v. Carmen, 582 F.Supp. 163 (D.D.C.1984), while the Speaker and bipartisan leadership of the House have intervened "to fulfill their time-honored duty of asserting the rights and privileges of the House of Representatives," see Motion of the Hon. Thomas P. O'Neill, Jr., et al., to Intervene at 4, Barnes v. Carmen
 
 
 [13]
 See also Moore v. United States House of Representatives, 733 F.2d 946, 950-54 (D.C.Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985)(holding that individual members of House of Representatives have standing to sue for declaration that a tax law was unconstitutional because it originated in the Senate rather than the House)
 
 
 [14]
 Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1978 (1023), heavily relied upon by the dissent is in no respect to the contrary. That case involved a Tenth Amendment challenge by Massachusetts to a federal statute that established certain standards for reducing maternal and infant mortality and provided for grants of funds to states complying with the standards. The Court stated:
 [T]he complaint of the plaintiff State is brought to the naked contention that Congress has usurped the reserved powers of the several States by the mere enactment of the statute, though nothing has been done and nothing is to be done without their consent; and it is plain that that question, as it is thus presented, is political and not judicial in character....
 Id. at 483, 43 S.Ct. at 599 (emphasis added). The Court was moved to dismiss the suit, not because it was brought by a state, but because no invasion of any state's power had occurred. The Court distinguished the case from, among other cases, Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920), a suit brought by a state in which "there was an invasion, by acts done and threatened, of the quasi-sovereign right of the State to regulate the taking of wild game within its borders." 262 U.S. at 482, 43 S.Ct. at 599. The Court concluded: "No rights of the State falling within the scope of the judicial power have been brought within the actual or threatened operation of the statute and this Court is ... without authority to pass abstract opinions upon the constitutionality of acts of Congress." Id. at 485, 43 S.Ct. at 600 (emphasis added). Clearly, then, Massachusetts v. Mellon did not establish that governmental officials and entities necessarily and always lack standing to raise claims of infringement of lawful functions. Rather, the case explicitly leaves open the possibility of suit by a state when "rights of the State falling within the scope of the judicial power" are at stake, a possibility later to become an actuality in, e.g., National League of Cities, supra.
 Similarly misplaced is the dissent's reliance on Allen v. Wright, supra. In Allen, the Court held that parents of black school children lacked standing to bring a suit against the I.R.S. alleging that I.R.S. regulations governing the tax-exempt status of racially discriminatory private schools interfered with the ability of the plaintiffs' children to obtain an education in desegregated schools. The Court reiterated the traditional standing criteria--concrete injury directly traceable to defendant's conduct and remediable by a favorable decision--and, echoing Valley Forge and Warth v. Seldin, supra, emphasized that those criteria are grounded in, and are to be applied with reference to, the principle of separation of powers. 104 S.Ct. at 3325. The case has nothing to do with "governmental standing," nor does the Court mention the subject.
 
 
 [15]
 Id. at 438-42, 59 S.Ct. at 975-77. That Coleman cannot fairly be distinguished on the ground that it concerned state, rather than federal, legislators' standing is clear from the Court's emphasis of "the legitimate interest of public officials and administrative commissions, federal and state, to resist the endeavor to prevent the enforcement of statutes in relation to which they have official duties." Id. at 442, 59 S.Ct. at 977
 Nor are we persuaded by the dissent's argument that Coleman's finding of cognizable injury was premised on a grant of standing by the state supreme court below and thus is inapposite to cases originating in federal court. A pair of earlier Supreme Court cases, cited in Coleman, is instructive in this respect. In Fairchild v. Hughes, 258 U.S. 126, 42 S.Ct. 274, 66 L.Ed. 499 (1922), a citizen of New York brought suit in the Supreme Court of the District of Columbia to challenge the effectiveness of the ratification of the Nineteenth (women's suffrage) Amendment. The court found the plaintiff to assert no judicially cognizable injury, and dismissed the suit. The same day, in Leser v. Garnett, 258 U.S. 130, 42 S.Ct. 217, 66 L.Ed. 505 (1922), the Court reached the merits of a similar challenge initiated in state court by a Maryland citizen. The fact that one case was brought in federal court while the other originated in state court, however, does not account for the differing results. The Fairchild Court stated the basis for its jurisdictional holding as follows:
 [P]laintiff is not an election officer; and the State of New York, of which he is a citizen, had previously amended its own constitution so as to grant the suffrage to women and had ratified this Amendment. Plaintiff has only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted. Obviously this general right does not entitle a private citizen to institute in the federal courts a suit to secure by indirection a determination whether a statute if passed, or a constitutional amendment about to be adopted, will be valid.
 258 U.S. at 129-30, 42 S.Ct. at 275 (citations omitted). By contrast, in Leser, the Court pointed out that "the constitution of Maryland limits the suffrage to men," 258 U.S. at 135, 42 S.Ct. at 217, and the "Legislature of Maryland had refused to ratify" the Nineteenth Amendment. Id. at 136, 42 S.Ct. at 217. The plaintiff in Leser thus could correctly claim that his vote would be diluted by adoption of the Nineteenth Amendment, whereas in Fairchild, that same claim was clearly false. That difference, we think, provides a more plausible basis for distinguishing the two cases than does the difference between the respective courts in which the suits originated.
 Similarly, we believe, the Coleman Court thought Leser a "controlling authority," 307 U.S. at 441, 59 S.Ct. at 976, not because both cases had come up from state courts, but rather because the plaintiffs in both asserted injury to their legal interest in an effective franchise. The majority stated: "The interest of the plaintiffs in Leser v. Garnett as merely qualified voters at general elections is certainly much less impressive than the interest of the twenty senators in the instant case." 307 U.S. at 441, 59 S.Ct. at 976. And Justice Frankfurter, writing separately, characterized the majority opinion thus: "The right of the Kansas senators to be here is rested on recognition by Leser v. Garnett, 258 U.S. 130, of a voter's right to protect his franchise." 307 U.S. at 469, 59 S.Ct. at 980. See also Dyer v. Blair, 390 F.Supp. 1291, 1297 n. 12 (N.D.Ill.1975) (three-judge court, per Stevens, J.) (reading Coleman as direct support for granting legislators standing to pursue in federal court claims of infringement of official role).
 
 
 [16]
 The concession was in terms based on the participation in this case by a single house of Congress, namely the Senate. See Tape Recording of Oral Argument at 204-11. Similarly, in Kennedy v. Sampson, 511 F.2d at 434, the Executive Branch noted that either or both houses would have standing to challenge a purported pocket veto. While, as the dissent correctly observes, parties may not create jurisdiction by mere stipulation, an interpretation of Article III's "case or controversy" requirement by a coordinate branch of the federal government must not be wholly disregarded
 
 
 [17]
 See Immigration & Naturalization Serv. v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 2782 n. 14, 77 L.Ed.2d 317 (1983) (citing historical sources). Also debated were the fraction of Congress necessary to override a veto and the question of whether the Judicial Branch ought to have a voice in the veto process. Id
 
 
 [18]
 Other comments are also enlightening. Elbridge Gerry saw "no necessity for so great a controul over the legislature as the best men in the Community would be comprised in the two branches of it." 1 M. FARRAND, supra, at 98. Similarly, Roger Sherman objected to "enabling any one man to stop the will of the whole" on the grounds that "[n]o one man could be found so far above all the rest in wisdom.... [W]e ought to avail ourselves of his wisdom in revising the laws, but not permit him to overrule the decided and cool opinions of the Legislature." Id. at 99. Benjamin Franklin, drawing on his experience with the government of Pennsylvania, voiced the specific fear that an absolute veto power would lead to a situation in which "[n]o good law whatever could be passed without a private bargain with [the Executive]." Id. at 99. Only two members--James Wilson and Alexander Hamilton--spoke in favor of an absolute negative. Id. at 98-100. Later, Hamilton himself eloquently defended the qualified veto as against the "more harsh" absolute veto power. See THE FEDERALIST No. 73 (A. Hamilton)
 
 
 [19]
 The only significant modification undergone by the Committee's draft after being reported back to the convention was in the time allotted to the President to consider bills, which was increased from seven to ten days
 
 
 [20]
 The only exception to Congress's control over its own adjournments is in case of a disagreement between the two houses "with Respect to the Time of Adjournment," in which case the President "may adjourn them to such Time as he shall think proper." U.S. CONST. art. II, Sec. 3
 
 
 [21]
 See Edwards v. United States, 286 U.S. 482, 486, 52 S.Ct. 627, 628, 76 L.Ed. 1239 (1932); J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES Sec. 891, at 652 (5th ed. 1905) (1st ed. Cambridge 1833)
 
 
 [22]
 The recognition of the purpose of the veto provision also underlies the Supreme Court's treatment of an issue related to the pocket veto, namely, whether the President may sign a bill into law during an adjournment of Congress. In La Abra Silver Mining Co. v. United States, 175 U.S. 423, 20 S.Ct. 168, 44 L.Ed. 223 (1899), the Court held that an intrasession adjournment does not preclude presidential approval of a bill. The Court reasoned:
 [I]n order that his refusal or failure to act may not defeat the will of the people, as expressed by Congress, if a bill be not approved and be not returned to the House in which it originated within that time, it becomes a law in like manner as if it had been signed by him. We perceive nothing in these constitutional provisions making the approval of a bill by the President a nullity if such approval occurs while the two Houses of Congress are in recess for a named time.
 Id. at 454, 20 S.Ct. at 178.
 Later, in Edwards v. United States, supra, the Court extended the reasoning and holding of La Abra to final adjournment of Congress. The Court stated:
 The last sentence of [Article I, section 7, clause 2] clearly indicates two definite and controlling purposes: First. To insure promptness and to safeguard the opportunity of the Congress for reconsideration of bills which the President disapproves; hence, the fixing of a time limit so that the status of measures shall not be held indefinitely in abeyance through inaction on the part of the President. Second. To safeguard the opportunity of the President to consider all bills presented to him, so that it may not be destroyed by the adjournment of the Congress during the time allowed to the President for that purpose.
 286 U.S. at 486, 52 S.Ct. at 628. Emphasizing that "[r]egard must be had to the fundamental purpose of the constitutional provision to provide appropriate opportunity for the President to consider the bills presented to him," id. at 493, 52 S.Ct. at 631, the Court concluded:
 No possible reason, either suggested by constitutional theory or based upon supposed policy, appears for a construction of the Constitution which would cut down the opportunity of the President to examine and approve bills merely because the Congress has adjourned. No public interest would be conserved by the requirement of hurried and inconsiderate examination of bills in the closing hours of a session, with the result that bills may be approved which on further consideration would be disapproved, or may fail although on such examination they might be found to deserve approval.
 Id. at 493-94, 52 S.Ct. at 431.
 
 
 [23]
 279 U.S. at 680, 49 S.Ct. at 466. The Court also rejected the argument that "within ten days" refers to ten legislative days rather than ten calendar days. Id. at 679-80, 49 S.Ct. at 466
 
 
 [24]
 582 F.Supp. at 165-66
 
 
 [25]
 See Joint Brief for the Plaintiff-Appellants and Senate Intervenor-Appellant, apps. I & II, at 63-70
 
 
 [26]
 The adjournment in Pocket Veto differs from that at issue here, not only in its much greater duration, but also in that it divided two very different sessions of Congress, a "long" session and a "lame-duck" session. Before passage of the Twentieth Amendment in 1933, each Congress lasted from March 4 of the odd-numbered year to March 3 of the next odd-numbered year. The first session of each Congress began on the first Monday in December, as provided in U.S. const., art. I, Sec. 4, cl. 2, and usually lasted well into spring. The second session commenced the following December, after the November congressional elections, and had to be adjourned by March 3. With many of its members having given up or lost their seats for the following term and with only a few months in which to work, Congress during its second session was unable to give serious consideration to many of the items before it. Adjournment of the first session hence in fact often precluded reconsideration
 
 
 [27]
 Rule XVIII of the Standing Rules of the Senate, S. Doc. No. 10, 98th Cong., 1st Sess. 13 (1983), provides:
 At the second or any subsequent session of a Congress the legislative business of the Senate which remained undetermined at the close of the next preceding session of that Congress shall be resumed and proceeded with in the same manner as if no adjournment of the Senate had taken place.
 House Rule XXVI states: "All business before committees of the House at the end of one session will be resumed at the commencement of the next session of the same Congress in the same manner as if no adjournment had taken place." Constitution, Jefferson's Manual and Rules of the House of Representatives, H. Doc. No. 271, 97th Cong., 2d Sess., Sec. 901, at 610-11 (1983). Further, "[t]he business of conferences between the two Houses is not interrupted by an adjournment of a session which does not terminate the Congress, and even where one House asks a conference at one session the other may agree to it in the next session." Id. at 611 annotation (citations omitted).
 In light of the carryover rules, it would be difficult to justify finding that return was prevented simply by delay alone. Because neither the Constitution nor the rules of either house place any time limit on reconsideration of returned bills, reconsideration of a bill returned during session could easily be delayed longer than reconsideration of a bill returned during adjournment.
 
 
 [28]
 Congressional committees, "which, in the legislative scheme of things, [are] for all practical purposes Congress itself," Doe v. McMillan, 412 U.S. 306, 344, 93 S.Ct. 2018, 2040, 36 L.Ed.2d 912 (1973) (Rehnquist, J., concurring and dissenting), are authorized during adjournments to continue to sit, to hold hearings, to conduct investigations, and to compel testimony and the production of documents. S.Doc. No. 10, supra note 27, at 33-34 (Rule XXVI); H.Doc. No. 271, supra note 27, Sec. 589, at 275
 
 
 [29]
 Wright, 302 U.S. at 595, 58 S.Ct. at 400. Congressional practice conforms to the modern understanding under the Twentieth Amendment that the houses of each Congress constitutionally exist from January 3 of each odd-numbered year through January 3 of the next odd-numbered year, regardless whether the houses are sitting or in adjournment. Thus, even when the houses are not in session, they can exchange messages and have bills enrolled, signed, and presented to the President. H.Doc. No. 271, supra note 27, Sec. 560, at 263 annotation (messages); id. Secs. 574-577, at 268-70 (enrollment, signing, and presentation); see, e.g., 129 Cong.Rec. S17,192 (daily ed. Nov. 18, 1983); 127 Cong.Rec. S15,632 (daily ed. Dec. 16, 1981); 125 Cong.Rec. 37,317, 37,475 (1979); 123 Cong.Rec. 38,948, 39,081 (1977); 121 Cong.Rec. 41,975, 42,276-77 (1975); 119 Cong.Rec. 43,327 (1973)
 
 
 [30]
 See supra p. 24
 
 
 [31]
 Id. The procedure for return during intersession adjournment is in every respect identical to the procedure used in intrasession adjournments, the constitutional effectiveness of which has been clear to both the Executive and the Legislative Branches since Wright. President Reagan himself has frequently delivered veto messages during an adjournment of Congress, by using this procedure. See Joint Brief for the Plaintiff-Appellant app. III, at 71-72
 No more uncertainty surrounds this procedure than accompanies the corresponding procedure by which the Executive Clerk receives bills for the President and returns them to Congress. See Eber Bros. Wine & Liquor Corp. v. United States, 337 F.2d 624, 167 Ct.Cl. 665 (1964) (delivery of bill to the Executive Clerk while the President is overseas constitutes effective "presentment"), cert. denied, 380 U.S. 950, 85 S.Ct. 1082, 13 L.Ed.2d 968 (1965).
 
 
 [32]
 The Ford Administration made its position on intersession pocket vetoes clear in the aftermath of Kennedy v. Jones, 412 F.Supp. 353 (D.D.C.1976), a case arising shortly after Sampson that involved a challenge by Senator Kennedy to two pocket vetoes, one during the intersession adjournment of the Ninety-third Congress and the other during a one-month intrasession adjournment of that Congress. The Executive Branch conceded to the entry of summary judgment in Senator Kennedy's favor. Attorney General Levi announced the President's decision that he would thereafter return disapproved bills during any intrasession and intersession adjournments of Congress, as long as appropriate arrangements for receipt of veto messages were made. 122 CONG.REC. 11,202 (1976). On December 31, 1975, and January 2, 1976, during Congress's intersession adjournment, President Ford vetoed, respectively, S. 2350 and H.R. 5900, which had been passed during the first session of the Ninety-fourth Congress. House Calendar, 94th Cong. 130-31 (final ed. 1977). The vetoed bills were accepted by the appointed officers of the respective houses and were noted in the respective journals. Senate Journal, 94th Cong., 1st Sess. 1431 (1975); House Journal, 94th Cong., 1st Sess. 2246-47 (1975). Upon the convening of the second session, the messages were laid before the houses. 122 CONG.REC. 2, 145 (1976). Both vetoes were sustained. House Calendar, 94th Cong. 130-31 (final ed. 1977)
 Like President Ford, President Carter also refrained from using the pocket veto during intersession adjournments. He returned S. 2096, 96th Congress, to the Senate, by delivery to the Secretary of the Senate, after the Senate had adjourned its first session sine die. 126 CONG.REC. 6-7 (1980).
 
 
 [33]
 The District Court apparently believed that to take the reality of intersession adjournments into consideration in determining whether they prevent return of disapproved bills would run afoul of the Supreme Court's recent statement that the fact that a practice might be "efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." Immigration & Naturalization Serv. v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 2780-81, 77 L.Ed.2d 317 (1983). We do not agree with the District Court that Chadha is apposite to the issue presented here. Chadha involved a procedure that, although of long-standing use, was nonetheless manifestly contrary to the dictates of the Constitution. By contrast, the issue here is whether the constitutional provision applies at all. No court can blind itself to the facts of a situation in determining whether it falls within the intended scope of a particular provision, as both the Pocket Veto Case and Wright plainly demonstrate. See also Edwards v. United States, 286 U.S. 482, 493, 52 S.Ct. 627, 631, 76 L.Ed. 1239 (1932) (construing veto provisions to permit President to approve bills after Congress has adjourned, on the ground that "[n]o public interest would be conserved" by a contrary rule), discussed supra, at note 22
 
 
 [34]
 See 2 M. FARRAND, supra p. 31, at 199-200 (debate over whether Congress should sit during Winter or Spring); Kennedy, Congress, the President, and the Pocket Veto, 63 VA.L.REV. 355, 362 (1977)
 
 
 [35]
 See Note, The Presidential Veto Power: A Shallow Pocket, 70 MICH.L.REV. 148, 165 (1971)
 
 
 [36]
 As Senator Ervin remarked:
 [A]t the time the Constitution was written and for many years thereafter, it was the custom of the Congress to meet only during the first few months of each year and then to go home. The 10-day provision obviously was written into the Constitution to cover the adjournments at the end of a session, since Congress would be absent from the Capitol for many months. Today, of course, we have a different situation entirely. The Founding Fathers ... did not foresee that Congress would become a year-round operation, often straining to finish its business before the constitutional end of a Congress.
 Constitutionality of the President's "Pocket Veto" Power: Hearing Before the Subcomm. on Separation of Powers of the Comm. on the Judiciary, United States Senate, 92d Cong., 1st Sess. 3 (1971); see Comment, The Veto Power and Kennedy v. Sampson: Burning a Hole in the President's Pocket, 69 NW.U.L.REV. 587, 610 (1974) ("[I]mproved transportation and a more burdensome workload have drastically altered the character of the congressional schedule. Journeys which in past years lasted days are now measured in hours. The modern Congress works almost year-round to complete a staggering agenda. These factors have produced congressional calendars marked by numerous short recesses rather than a single lengthy one.").
 
 
 [37]
 Thus, contrary to appellees' understanding, whether return was prevented within the meaning of the pocket veto clause and whether return was practically impossible are not two "very different" questions, Brief for the Appellees at 58, but rather are one and the same question. To determine "constitutional prevention" is, as the Court's approach in Pocket Veto and Wright makes clear, precisely to determine "actual prevention"; such a determination cannot be made without regard for "the manifest realities of the situation." Wright, 302 U.S. at 595, 58 S.Ct. at 400. The distinction appellees draw between the two issues simply defies logic and common sense
 
 
 [1]
 The Executive Branch conceded at oral argument that the Senate has standing to sue in this suit. Similarly, in Kennedy v. Sampson, 511 F.2d 430, 435 (D.C.Cir.1974), the Executive Branch conceded that either House of Congress would have standing to sue based on injury to its lawmaking powers. That concession does not, of course, remove the issue from this dispute, for it is axiomatic that parties cannot confer subject matter jurisdiction by waiver. No reason appears why the Executive should oppose standing for individual legislators but concede as to a House. The constitutional problems would seem to be identical. More important is the misunderstanding of the importance of the issue that underlies this concession. According to counsel, the Executive Branch is pursuing decision on the merits to vindicate its governmental interest in constitutional governance. While this is undoubtedly true, I suggest that, given this concern, appellees have misordered the priorities. By conceding the standing issue appellees endanger a constitutional principle far more momentous than the scope of the pocket veto power, especially since the latter issue can arise and be decided later in a private suit
 
 
 [2]
 Indeed, this court has so held, on the authority of Kennedy v. Sampson. AFGE v. Pierce, 697 F.2d 303, 305 (D.C.Cir.1982). In Pierce, employees of a federal agency, their union, and Congressman Sabo sued to enjoin a proposed reduction-in-force on the grounds that it was a reorganization of the agency barred by statute in the absence of prior approval by the House Appropriations Committee. Id. at 304. The district court held that Congressman Sabo had standing and did not decide whether the employees or their union could sue. The case was taken as an emergency expedited appeal, and the panel, on which I sat, held that Congressman Sabo did not have standing as a member of the House of Representatives, but did have standing as a member of the Appropriations Committee. Id. at 305. Citing Kennedy, the per curiam opinion held that the statute gave each member of the Appropriations Committee the right to participate in approval of any reorganization of the agency. Hence "[t]he Secretary's actions injured him by depriving him of that specific statutory right to participate in the legislative process." Id. Since Congressman Sabo had standing, the panel did not decide "the question whether the district court was the appropriate forum for the employees' complaint." Id. at 304. My vote in Pierce is, of course, inconsistent with the position I adopt in this dissent and previously adopted in my concurrences in Vander Jagt v. O'Neill, 699 F.2d 1166, 1177 (D.C.Cir.1983), and Crockett v. Reagan, 720 F.2d 1355, 1357 (D.C.Cir.1983). I overlooked the latent separation-of-powers issues in that case, which was my first encounter with this court's congressional standing doctrine, and in which, because of the emergency nature of the appeal, the opinion was released one day after oral argument. See Pierce, 697 F.2d at 303
 
 
 [3]
 This court has rejected some efforts by legislators to sue on the basis of "the allegedly improper execution of an enacted law," on the grounds that "[t]he injury to the legislator was a generalized grievance about the conduct of government, not a claim founded on injury to the legislator by distortion of the process by which a bill becomes law." Moore v. U.S. House of Representatives, 733 F.2d 946, 952 (D.C.Cir.1984) (explaining Harrington v. Bush, 553 F.2d 190 (D.C.Cir.1977), and AFGE v. Pierce, 697 F.2d 303 (D.C.Cir.1982), as involving only generalized complaints). The attempted distinction is untenable. If a President refused to enforce a law Congress had validly enacted, that would nullify legislators' votes and impair the lawmaking powers of Congress just as surely as if the President had employed the pocket veto. Yet, under the distinction drawn in Moore, a refusal to enforce would be treated as giving rise to nothing more than a generalized grievance, while the pocket veto would be treated as occasioning an injury "to the members' rights to participate and vote on legislation in a manner defined by the Constitution." 733 F.2d at 951. The grounds for this difference in treatment are that a legislator has "a right and a duty to participate" in the process by which a bill becomes law. Id. at 952. That may be, but the legislator whose vote is nullified by a pocket veto has exercised his right and fulfilled his duty--it is the impairment of his lawmaking power that, on this court's analysis, gives him standing to sue. Since that impairment occurs whenever a President fails to enforce the law as Congress intended it, enforcement challenges must be heard if this court's rationale is to be fairly applied. Thus, this court's view of standing, applied in a principled fashion, would move the obligation to "take Care that the Laws be faithfully executed" out of article II of the Constitution and divide it between articles I and III
 
 
 [4]
 The majority clearly believes that Chapman v. FPC, 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953), establishes that this is already the law, but as shown infra at pp. 64-66, that case does not at all have the import the majority ascribes to it
 
 
 [5]
 Lest this be regarded as fantasy or burlesque, it should be noted that this very sort of litigation within the judicial branch is being attempted. See In re Robson and Will, petition for mandamus or in the alternative for cert. filed, 53 U.S.L.W. 3552 (U.S. Feb. 5, 1985) (No. 84-1127) (United States District Judges seeking relief against Court of Appeals on grounds that Court of Appeals improperly substituted its discretion for that of the District Court, and exceeded its authority by ordering a remedy that is contrary to law). The possibilities seem boundless
 
 
 [6]
 The majority claims that Massachusetts v. Mellon is "in no respect ... contrary" to the majority's position. Maj. op. at 27 n. 14. But the majority then proceeds to explain that case and cases that came afterward, such as National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), overruled on other grounds, Garcia v. San Antonio Metropolitan Transit Authority, --- U.S. ----, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), in a way that shows Massachusetts v. Mellon to be contrary to its position in every respect. Thus, the majority quotes a passage from that decision pointing out that Massachusetts complained of federal usurpation of the reserved powers of the states "by the mere enactment of the statute, though nothing has been done and nothing is to be done without their consent." Maj. op. at 27 n. 14 (quoting 262 U.S. at 483, 43 S.Ct. at 599). The majority concludes its discussion with the statement that "Massachusetts v. Mellon did not establish that governmental officials and entities necessarily and always lack standing to raise claims of infringement of lawful functions. Rather, the case explicitly leaves open the possibility of suit by a state when 'rights of the State falling within the scope of the judicial power' are at stake, a possibility later to become an actuality in, e.g., National League of Cities." Maj. op. at 27 n. 14. That neatly expresses my point, not the majority's. The difference between Massachusetts v. Mellon and National League of Cities is that in the former only an injury to governmental powers was alleged while in the latter states and cities were required by federal statute to expend money. See National League of Cities, 426 U.S. at 846-47, 96 S.Ct. at 2471-72. That was the concrete injury in fact that conferred standing. The case now before us alleges only a usurpation of governmental powers and hence, on the teaching of the two Supreme Court decisions cited, is outside our jurisdiction. In short, Massachusetts v. Mellon is to National League of Cities as the present case is to the Pocket Veto Case
 
 
 [7]
 In The Pocket Veto Case, Congress passed a bill authorizing certain Indian tribes to present their claims against the United States to the Court of Claims. 279 U.S. at 672, 49 S.Ct. at 463. The bill was presented to the President less than ten days before an intersession adjournment, id.; the President neither signed the bill nor returned it to the originating house, and the bill was not published as a law. Id. at 673, 49 S.Ct. at 464. The Indian tribes took the position that the bill became law, and filed a petition in the Court of Claims raising various claims in accordance with the terms of the bill. The United States defended on the ground that the bill had not become law under article I, section 7, and the Court of Claims dismissed the petition for that reason. Id. The Supreme Court allowed a member of the House Committee on the Judiciary to appear as an amicus, but there was no suggestion that any legislator had standing to sue. Id
 Wright v. United States, 302 U.S. 583, 58 S.Ct. 395, 82 L.Ed. 439 (1938), followed the same format. Congress passed a bill giving the Court of Claims jurisdiction to adjudicate Wright's claim against the United States. 302 U.S. at 586, 58 S.Ct. at 396. The United States opposed Wright's petition, arguing that the bill had never become law, and the Court of Claims agreed. Id. Moreover, the same pattern is evident in the other Supreme Court cases that have interpreted the presentation clause. Edwards v. United States, 286 U.S. 482, 52 S.Ct. 627, 76 L.Ed. 1239 (1932), involved a private bill giving the Court of Claims jurisdiction to adjudicate Edwards' claim against the United States; the Court of Claims certified to the Supreme Court the question whether the bill became law, given that it had been signed by the President after a final adjournment but within ten days of presentation. Id. at 485, 52 S.Ct. at 628; La Abra Silver Mining Co. v. United States, 175 U.S. 423, 20 S.Ct. 168, 44 L.Ed. 223 (1899), differs only in that there Congress passed a bill authorizing the Attorney General to bring suit in the Court of Claims to determine whether an award made by a United States Commission to La Abra had been obtained by fraud. 175 U.S. at 441, 20 S.Ct. at 175. Consequently, in La Abra the private party, rather than the government, raised the defense that the bill had not become law, because signed by the President during a congressional recess. Id. at 446, 451, 20 S.Ct. at 176, 177. These cases provide no support for conferring standing to raise presentation clause issues on congressional plaintiffs.
 
 
 [8]
 It is also well settled that the states would not have standing to assert such generalized grievances on behalf of their citizens. Massachusetts v. Mellon also holds that a State, as parens patriae, may not "institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof," because "it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government." 262 U.S. at 485-86, 43 S.Ct. at 600-01. The Supreme Court recently reaffirmed that holding in Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 610 n. 16, 102 S.Ct. 3260, 3270 n. 16, 73 L.Ed.2d 995 (1982), while indicating that a state would have standing as parens patriae to "secure the federally created interests of its residents against private defendants." Id. This illustrates, rather dramatically one would think, that what is a sufficient injury in fact when asserted against a private defendant may, for reasons of separation of powers and federalism, be deemed insufficient to confer standing against a branch of the federal government. It is precisely these reasons of separation of powers and federalism that compel the parallel conclusion that injury to governmental powers does not constitute an injury in fact or a judicially cognizable injury, as the Supreme Court has elaborated those terms in connection with the article III standing requirements
 Lest this point be misunderstood, I emphasize that I do not read either Mellon or Snapp as holding that the prohibition on state parens patriae suits against the federal government is in all cases a constitutional limitation rather than a prudential one. In my view, that prohibition is a constitutional requirement where, as in Mellon, individuals within the state would lack standing to sue because they have suffered no injury that is judicially cognizable under article III. To permit Congress to confer standing on a state in such a case would be to authorize evasion of the constitutional standing requirements by allowing the state as a representative of its citizens to sue when those who are represented could not. But where private individuals could satisfy the injury in fact requirement of article III, there is no threat to separation of powers or to federalism in allowing Congress to confer parens patriae standing on the state as the representative of persons who have suffered a concrete injury and would themselves have standing. Consequently, in this second category of cases the rule is prudential and, although fully binding on the courts until Congress acts, may be eliminated by congressional enactments.
 
 
 [9]
 The majority insists that Allen v. Wright has "nothing to do with 'governmental standing,' " but it concedes that Allen v. Wright emphasized that "the traditional standing criteria" are "grounded in, and are to be applied with reference to, the principle of separation of powers." Maj. op. at 28 n. 14. The majority cannot have it both ways. My disagreement with the majority, put in the technical terms of traditional standing criteria, is over whether impairment of governmental powers is a judicially cognizable injury, that is, an "injury in fact" for purposes of article III. Just as Massachusetts v. Mellon demonstrates that considerations of federalism limit the category of judicially cognizable injury in controversies between a state and the United States, Valley Forge and Allen v. Wright show, not only in their general approach but in their specific application of the "traditional standing criteria," that considerations of separation of powers have the same limiting effect. In Valley Forge the Court held that the unconstitutional government conduct plaintiffs had alleged did not constitute a judicially cognizable injury, because "[a]lthough [they] claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by the plaintiffs as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." 454 U.S. at 485, 102 S.Ct. at 765. Yet, as the Valley Forge Court undoubtedly was aware, psychological consequences are familiar bases for claims in other legal contexts. The Supreme Court's refusal to treat the psychological effects of allegedly unconstitutional government conduct as judicially cognizable "can only mean that the Court perceives that to confer standing in such cases would impermissibly alter its function." Vander Jagt, 699 F.2d at 1178 (Bork, J., concurring)
 Similarly, in Allen v. Wright, although recognizing that the stigmatizing injury caused by racial discrimination will confer standing in some circumstances, 104 S.Ct. at 3327, the Court held that the plaintiffs did not have standing because they were not personally subject to the discrimination they challenged. Id. To treat this "abstract stigmatic injury" as cognizable, the Court stated, would transform the federal courts into "no more than a vehicle for the vindication of the value interests of concerned bystanders." Id. (quoting United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)).
 The Allen v. Wright Court's treatment of the "fairly traceable" requirement even more clearly takes a separation-of-powers approach. The "fairly traceable" requirement "examines the causal connection between the assertedly unlawful conduct and the alleged injury." 104 S.Ct. at 3326 n. 19. Yet, though the Court recognized that the challenged IRS tax-exemption practices might make some difference to the ability of plaintiffs' children to receive a desegregated education, and though it conceded that that harm is not only judicially cognizable but "one of the most serious injuries recognized in our legal system," id. at 3328, it nonetheless held that the causation requirement was not met. Why? Because, the Court said, "we rely on separation of powers principles to interpret the 'fairly traceable' component of the standing requirement." Id. at 3330 n. 26. It is evident, then, that the majority's assertion that Allen v. Wright is irrelevant to governmental standing is unsupportable, and ignores both that opinion's general approach to the purposes of the standing doctrine and its application of the technical standing criteria.
 
 
 [10]
 The Council of Revision was initially rejected when Gerry's motion "which gave the Executive alone without the Judiciary the revisionary control on the laws" was adopted. 1 M. Farrand, The Records of the Federal Convention of 1787, at 104 (1st ed. 1911) (June 4, 1787). On three occasions thereafter Madison and Wilson renewed the proposal for the Council of Revision, each time without success. 1 M. Farrand, supra, at 138, 140 (June 6, 1787); 2 M. Farrand, supra, at 73, 80 (July 21, 1787); 298 (Aug. 15, 1787). Gerry raised the objection that the power of judicial review was sufficient to protect the judiciary from "encroachments on their own department," and protested that review of public policy was no part of the judicial function. 1 M. Farrand, supra, at 97-98. King and Dickinson argued in addition that the proposal would dilute the executive's unitary character and make it less accountable for the use to which this power was put. Id. at 139, 140. Strong worried that the judges might be unable to be impartial in interpreting the laws if they were given a part in making them, 2 M. Farrand, supra, at 75, Luther Martin pointed out that the judges could not be presumed more expert in legislative affairs than the legislators, id. at 76, and Ghorum urged that the judges might well sacrifice the executive rather than support him against the legislature. Id. at 79
 
 
 [11]
 See, e.g., 1 M. Farrand, The Records of the Federal Convention of 1787, at 97 (1st ed. 1911) (remarks of Gerry); 109 (remarks of King); 2 M. Farrand, supra, at 76 (remarks of L. Martin); 93 (remarks of Madison); 299 (remarks of Gouverneur Morris). But see 2 M. Farrand, supra, at 298 (remarks of Mercer); 299 (remarks of Dickenson)
 
 
 [12]
 Tocqueville saw this point as well. After speaking of the American practice of leaving the invocation of judicial power to contests of private interest, he said:
 I am inclined to believe this practice of the American courts to be at once most favorable to liberty and to public order. If the judge could attack the legislator only openly and directly, he would sometimes be afraid to oppose him; and at other times party spirit might encourage him to brave it at every turn. The laws would consequently be attacked when the power from which they emanated was weak, and obeyed when it was strong; that is to say, when it would be useful to respect them, they would often be contested; and when it would be easy to convert them into an instrument of oppression, they would be respected.
 
 
 [1]
 A. de Tocqueville, supra, at 107
 
 
 [13]
 The standing requirements of article III are jurisdictional--discretion plays no part in their application. The prudential standing requirements are no less jurisdictional. I am aware of no case in which the Court has held that a lower federal court may decide that those requirements need not be satisfied if the court thinks it would be inequitable to deny standing
 
 
 [14]
 The only justification for Riegle's claim that separation-of-powers considerations are irrelevant to the standing inquiry was an inference from the fact that the Supreme Court vacated our judgment finding standing in Goldwater v. Carter, 617 F.2d 697 (D.C.Cir.), judgment vacated on other grounds, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979), on grounds of nonjusticiability, with some Justices relying on the ripeness doctrine and others on the political question doctrine. Riegle, 656 F.2d at 880. That inference was dubious to begin with, for Justices who found the case nonjusticiable on other grounds had no need to discuss standing. The evidence, which I have already recited in Part II-C supra, that the Court now regards separation-of-powers considerations as inseparable from the constitutional component of standing analysis, consists of explicit statements by the Court, rather than inferences from statements the Court did not make because there was no need to make them. Therefore, even if Riegle was a justifiable departure from this court's established standing analysis, which I do not believe, there is no warrant whatsoever for adhering to that departure in the wake of the invalidation of the premise on which it rested
 
 
 [15]
 The majority offers a different basis for distinguishing between Leser and Fairchild--the fact that the plaintiff in Leser was a citizen of Maryland, which had refused to extend suffrage to women, while the named plaintiff in Fairchild was a citizen of New York, which had amended its constitution to grant women suffrage. See maj.op. at 28 n. 15. The majority finds this difference a "more plausible basis for distinguishing the two cases," but that would be irrelevant even if it were true. The question is not how we would distinguish those cases, but how the Coleman Court distinguished them, and it is clear that the basis offered by Chief Justice Hughes was that in Leser the citizen's suit was commenced in state court and allowed to go forward under the laws of the state, whereas in Fairchild the suit was brought in federal court. Indeed, the Chief Justice made no mention whatsoever of the fact that the only named plaintiff in Fairchild was a citizen of New York. He described Fairchild as simply "a suit by citizens of the United States," 307 U.S. at 440, 59 S.Ct. at 976
 The majority concludes that the Coleman Court shared its novel rationale for distinguishing Leser from Fairchild, because the Court said that "[t]he interest of the plaintiffs in Leser v. Garnett as merely qualified voters at general elections is certainly much less impressive than the interest of the twenty senators in the instant case." 307 U.S. at 441, 59 S.Ct. at 976. The quoted language implies, at most, only that the Coleman Court was unwilling to take the position that in any case in which a state court determined that the plaintiffs had standing, no matter how remote, abstract, or generalized the plaintiffs' grievance might be, the Supreme Court would be bound to review the state court's decision if it fell within the Court's statutory jurisdiction. That does not alter the fact that the Coleman Court perceived the interest of the Kansas legislators as of a type that would not give them standing to bring suit in federal court.
 
 
 [16]
 It may be that Coleman drew the distinction it did, and thus allowed review of a claim heard in a state court under state standing rules more permissive than federal standing rules, because to deny review in such cases would leave in place a body of state court interpretations of the federal Constitution that the Supreme Court could never pass upon. The result might be federal constitutional law that differed from state to state. The problem of erroneous or differing state court interpretations of the United States Constitution and laws can be avoided only if the Supreme Court accepts the state's basis of standing as sufficient for review or if it requires state courts to apply federal standing rules in order to entertain suits based on federal law
 Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), can be read as adopting the latter course. In Doremus, the Court characterized the state court's opinion as "advisory" and dismissed the appeal (from a declaratory judgment that a state statute was constitutional) on the grounds that "because our own jurisdiction is cast in terms of 'case or controversy,' we cannot accept as the basis for review, nor as the basis for conclusive disposition of an issue of federal law without review, any procedure which does not constitute such." 342 U.S. at 434, 72 S.Ct. at 397 (emphasis added). The emphasized language suggests that the Court might have vacated a state court judgment enjoining enforcement of the statute, but that the Court would simply dismiss an appeal from a state court judgment upholding the challenged statute (as the Doremus Court in fact did). If Doremus means that the Supreme Court has adopted this approach as one of general applicability, it would follow that there is yet another reason why Coleman lends no support to the majority's position: even Coleman's narrow holding would then no longer be good law because that holding expressly rests on the state court's decision that the state senators had standing to sue under state law.
 
 
 [17]
 Justice Douglas, joined in dissent by Justice Black and Chief Justice Vinson, pointed out that the Roanoke Rapids site was a part of the public domain, because (1) the Roanoke is a navigable stream over which Congress has plenary power, (2) the water power inherent in a navigable stream belongs to the federal government, and (3) the dam sites on a navigable stream are public property even if the title to the streambed is in private hands. 345 U.S. at 176, 73 S.Ct. at 621. Justice Douglas thought that the public nature of the site suggested, on the merits, that Congress had not intended to authorize private development. See id. at 177, 73 S.Ct. at 622. The Court majority disagreed, not on the grounds that the site was not in the public domain, but because it viewed the pertinent legislation as "a legislative finding that the proposed projects, no matter by whom they may be built, are desirable and consistent with the congressional standards for the ordered development of the Nation's water resources." Id. at 163, 73 S.Ct. at 615. It is clear, then, that the Secretary was in substance alleging that rights over property in the public domain had, by the action of the Commission, improperly been vested in private hands
 
 
 [18]
 Concurring in Vander Jagt, 699 F.2d at 1177, I suggested that we adhere to the "distinction between diminution of a legislator's influence and nullification of his vote," 699 F.2d at 1180, which the en banc court had adopted in Goldwater v. Carter, 617 F.2d 697 (D.C.Cir.), judgment vacated on other grounds, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979). Under the Goldwater test, congressional plaintiffs have standing only if "the alleged diminution in congressional influence ... amount[s] to a disenfranchisement, a complete nullification or withdrawal of a voting opportunity." 617 F.2d at 702. By contrast, the position adopted by the panel opinion in Vander Jagt treats any substantial diminution of a legislator's influence on the legislative process as a judicially cognizable grievance. Vander Jagt, 699 F.2d at 1168; see also Riegle, 656 F.2d at 880. Upon further reflection, it seems to me that not even the Goldwater "nullification" test is adequate to the standing inquiry. When the interest sought to be asserted is one of governmental power, there can be no congressional standing, however confined
 To begin with, it is impossible to find in the structure of the Constitution a limited doctrine of congressional standing. The history and structure of the Constitution rule out the possibility that the Framers intended article III jurisdiction to extend to intra-branch or inter-branch disputes over infringement of official powers. That being so, there is no room to argue--nor any suggestion in the text of the Constitution--that they intended to single out the nullification of a legislator's vote for special treatment. The ultimate question is whether the provisions in the Constitution that confer various governmental powers on the coordinate branches and reserve powers to the states were meant to serve as a direct and independent basis for judicial review. As I have shown in Part IV of this opinion, that is unquestionably not what the Framers intended. As I have shown in Part I, if their intentions are to be overridden in the name of vindicating constitutional grants of governmental power, they must be overridden wherever the Constitution or other law makes such a grant. The results of that rationale, as I have shown in Parts II and III, are incompatible with binding Supreme Court precedent on the subject of standing. The conclusion must be that even the Goldwater test allows us a jurisdiction and a power that article III forbids.
 
 
 [19]
 The panels in Riegle and Vander Jagt explicitly refused to consider separation-of-powers implications in connection with the standing inquiry. See Riegle, 656 F.2d at 880; Vander Jagt, 699 F.2d at 1170 & n. 5. In Harrington v. Bush, 553 F.2d 190 (D.C.Cir.1977), the court did suggest that separation-of-powers issues should play some role in its standing inquiry, id. at 215, but it also stated that "we do not rest our denial of standing on these separation of powers grounds." Id. The opinion for the en banc court in Goldwater, 617 F.2d 697, at most assigned only this supportive, nondispositive weight to separation-of-powers considerations. In Moore, the panel opinion acknowledged that Valley Forge "reinforces the principle that where separation-of-powers concerns are present, the plaintiff's alleged injury must be specific and cognizable in order to give rise to standing." 733 F.2d at 951 (footnote omitted). But there was no discussion whatsoever of whether impairment of a legislator's official powers could be treated as judicially cognizable injury without violating that "principle." The panel contented itself with the bare assertion that "[t]he injury alleged by appellants here is to an interest positively identified by the Constitution." Id
 
 
 [20]
 Riegle explained the need to invoke the equitable discretion doctrine in cases where legislative redress is available on the grounds that in disputes between a member of Congress and "his fellow legislators," "separation-of-powers concerns are most acute." The reason Riegle proposes for this claim is that in such cases "[j]udges are presented not with a chance to mediate between the two political branches but rather with the possibility of thwarting Congress's will by allowing a plaintiff to circumvent the processes of democratic decisionmaking." Id. That distinction is factitious. The "processes of democratic decisionmaking" are circumvented and the will of one of the political branches thwarted when this court adjudicates the lawmaking powers of Congress vis-a-vis the President no less than when it adjudicates the lawmaking powers of a congressional plaintiff vis-a-vis Congress. In either situation, what is objectionable--for purposes of the standing issue--is not the question being adjudicated but the fact that the plaintiff is allowed to sue on the basis of an alleged impairment of its or his lawmaking powers
 
 
 [21]
 In Melcher v. Federal Open Market Committee, C.A. No. 84-1335, now pending in the district court, a United States Senator has brought an action the district court has characterized as identical to Senator Riegle's suit in Riegle. Mem. order at 1 (Sept. 28, 1984). Relying on Riegle, the district court in Melcher has stayed that action pending this court's decision in Committee for Monetary Reform v. Board of Governors of the Federal Reserve System, C.A. No. 83-1930, which will determine whether another district court correctly held that "a group of over 800 plaintiffs seeking the same relief that Senator Melcher seeks" lacked standing. Mem. order at 2. As the district court in Melcher explained, if this court holds that the private plaintiffs have standing, then Senator Melcher's action should be dismissed under Riegle. If, on the other hand, this court holds that the private plaintiffs lack standing, "then in light of Riegle and subsequent cases, a decision may have to be made whether the instant case should be decided on the merits or dismissed for separation of powers reasons." Mem. order at 2-3 (footnote omitted)